[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 16, 2004
THOMAS K. KAHN
CLERK**

No. 03-14894

D.C. Docket No. 01-02406-CV-ODE-1

DEBBIE JANINE HIGDON,

Plaintiff-Appellant,

versus

JERRY JACKSON, Individually and in
his official capacity as Commissioner,
Georgia Department of Revenue, State of Georgia,
EMMA EBERHARDT, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia

**(December 16, 2004)**

Before EDMONDSON, Chief Judge, PRYOR and FAY, Circuit Judges.

PRYOR, Circuit Judge:

The main issue presented in this appeal is whether Debra Janine Higdon can

establish a prima facie case of retaliation against two employees of the State of Georgia because, months after Higdon complained of disability discrimination, the first employee treated Higdon rudely and the second employee bumped her car into Higdon's car, but caused no damage and had no exchange of words. Because Higdon failed to establish that the first employee's rude behavior was an adverse action and Higdon failed to show a causal relation between the car bumping by the second employee and Higdon's complaint of discrimination, Higdon cannot establish a prima facie case of retaliation under the Americans with Disabilities Act. We affirm the summary judgment entered against Higdon's retaliation claim, and we affirm the summary judgment entered against her claims under state law.

## I. BACKGROUND

To understand the context of this appeal, we first review three aspects. The first is the testimony regarding Higdon's physical impairment. The second is the events about which Higdon complained and the alleged retaliation. The third is the proceedings in the district court that led to this appeal.

### A. Higdon's Testimony Regarding Her Physical Impairment

In 1994, Debra Janine Higdon was injured in a car accident that crushed her left leg. According to her testimony, Higdon cannot walk well without the use of a leg brace or cane. Higdon has no difficulty driving, but she has a disabled

2

parking permit. She testified that she is "mobile and able to move around" with the use of a brace, and she is able to perform normal life activities, "such as going to the grocery store, taking [her] kids to school, or anything else that usually would be associated with a homemaker and mother" with the assistance of a brace. At the grocery store, she uses a motorized cart provided by the store. Higdon is able to "walk for periods of time." She cannot "walk for a long distance, [or] go to an amusement park," however. She cannot tolerate any exercise except swimming.

### B. The Events About Which Higdon Complained and the Alleged Retaliation

From the middle of 1997 until the end of 2000, Higdon was self-employed as a commercial car title processor. She regularly processed car titles at the Georgia State Motor Vehicle Office on Trade Port Boulevard in Atlanta, Georgia. Before September 1999, Higdon performed her work by submitting applications for car titles to the Trade Port office and then returned to retrieve the titles after several days. Higdon completed this process without waiting long in line.

In September 1999, Georgia changed the process for obtaining car titles. Georgia began using a new computer-based title and registration system, the Georgia Registration and Title Information System ("GRATIS"). To implement

3

GRATIS, the entire state tag and title system was taken offline for approximately nine days.

With GRATIS, commercial processors could not deliver applications to the Trade Port office and return later to retrieve the titles. Both commercial title processors and other applicants were required to wait in separate lines to obtain car titles. The Trade Port office used separate lines because commercial processors had a larger volume of titles to obtain than applicants for personal car titles, and commercial processors were compensated for their time. The combination of a nine-day backlog, glitches in the new system, and the new waiting lines caused long waits for commercial processors when the Trade Port office reopened.

With this new system, the Trade Port office established a separate line for disabled applicants for titles to personal cars and a separate window for all disabled applicants set at the height of a wheelchair. Commercial processors were not allowed to use the line for disabled applicants for titles to personal cars. When a disabled commercial processor reached the front of the commercial line, she could use the disabled window to conduct business. The Trade Port office established this policy so that commercial processors, with their high volume of applications and compensation for their time, would be treated equally, and

4

disabled commercial processors would not gain an economic advantage from waiting in the shorter line with prompt access to the disabled window.

1. Higdon's Request for an Accommodation for Her Alleged Disability

When the Trade Port office reopened on September 8, 1999, Higdon arrived to a line for commercial processors that stretched outside the front door. After waiting in line for approximately three and one-half hours, Higdon's left leg swelled and hurt. She waited about fifteen more minutes and then asked Mary McMichael, a Department of Motor Vehicles supervisor, for permission to use the disabled line. Higdon complained about her leg injury, that she was in pain, and that her leg was swelling from standing in line. McMichael denied her request because Higdon was a commercial processor and the policy did not allow commercial processors to use the disabled line. Higdon then showed McMichael her disabled parking permit and again asked if she could use the disabled line. McMichael "said, no, sorry," and left.

Shortly thereafter, McMichael returned and offered Higdon an office chair on rollers so Higdon could sit while she was waiting in line. Higdon testified that McMichael "scooted [the chair] towards [Higdon]," and "as she was walking away made a comment, here's a chair, and walked off." Higdon did not use the chair, however, because "it's harder . . . to get up and down and to control [her] legs in a

sitting position than it would be . . . just to stand." She also stated that she would have been unable to maneuver the chair in the line with her leg immobilized and her hands filled with title processing files. Before leaving, Higdon obtained the titles that she sought that day.

During the remainder of September, the length of the lines steadily decreased. All commercial processors, including Higdon, were still required to stand in the commercial line and were not allowed to proceed directly to the disabled window. Higdon testified that she made several more requests for an accommodation, other than using the office chair in line. The only accommodation she requested was to be treated the same as an applicant for a title for a personal car who was allowed to use the disabled line and proceed directly to the disabled window.

### 2. Higdon's Formal Complaint of Discrimination

After she was denied use of the disabled line, Higdon hired an attorney. On September 29, 1999, Higdon's attorney sent a letter of formal complaint to McMichael; Milton Dufford, Deputy Commissioner of the Department of Revenue; Jerry Jackson, Commissioner of the Department of Revenue; and Steve Franczi, Director of Risk Management for the Department of Administrative Services. This letter requested a change in the way Higdon was allowed to

process titles. The letter stated that Higdon was disabled and "demand[ed] that she be immediately permitted to utilize the handicapped line and window to process her work."

On November 3, 1999, Higdon met with an insurance investigator hired by the State of Georgia in response to her complaint. Higdon requested that she be treated the same as disabled applicants for titles for personal cars. The state rejected Higdon's complaint in February 2000.

### 3. The Trade Port Office Assigns Days for Commercial Processors

On November 9, 1999, the Trade Port office assigned commercial processors working for more than one automobile dealer a specific day of the week in which to come to the office to process their titles. Higdon worked for more than one dealer and was assigned one day of the week on which she could process titles at the Trade Port office.

### 4. McMichael's Alleged Retaliation

On December 31, 1999, three months after her formal complaint, Higdon was in line at a bank near the Trade Port office in her Ford F150 pickup truck. McMichael was driving a Honda del Sol which bumped into Higdon's car. Higdon testified that she exited her car to look at her bumper, and then observed who hit her. Higdon recognized McMichael and approached the driver's side of

her car. Higdon testified that McMichael made eye contact, only stared at her, and did not say anything. It is undisputed that there was no damage to either Higdon's car or McMichael's car.

### 5. Higdon Changes Jobs and Avoids Waiting in Line

In early March 2000, Higdon changed the nature of her job and began processing titles for a single vehicle auction company. This new job change allowed Higdon to avoid waiting in line, fax title applications, and retrieve the titles on the following day. The change also allowed her to do business at the Trade Port office on any day it was open. Higdon spoke with at least two employees about her change in status. Although she did not speak with Emma Eberhardt, a Department of Motor Vehicle Supervisor, about her status change, the other two employees told Higdon they would inform Eberhardt.

### 6. Eberhardt's Alleged Retaliation

On March 9, 2000, Higdon went to the Trade Port office to retrieve her processed titles. Higdon testified that Eberhardt informed Higdon that she could not be at Trade Port because it was not her assigned day. After Higdon explained her new position and Eberhardt reviewed the titles Higdon had that day, Eberhardt told Higdon that she could come into the office on any day of the week because Higdon now worked for a single automobile dealer. Eberhardt admits that she

8

made this accusation without first checking Higdon's paperwork. Higdon testified that the conversation "was civil, but the way she did it in front of others was embarrassing."

Higdon testified that similar incidents occurred on two other occasions. Eberhardt confronted Higdon about not being at the Trade Port office on the correct day. On one occasion, Eberhardt told Higdon that Eberhardt had been told that Higdon was working for other dealers. After Eberhardt checked Higdon's paperwork, Eberhardt allowed her to continue processing titles on any day of the week. Eberhardt did not apologize for the confusion, although Higdon contends, she was "rude," "short and to the point." Eberhardt was not condescending or belligerent, however, and did not use any off-color language or curse.

Higdon left the commercial title business at the end of 2000. Higdon began working as a real estate agent in May 2001, and she currently works in that position.

### C. Procedural History

On September 7, 2001, Higdon filed a complaint against Jackson, Eberhardt, McMichael, and Dufford. Higdon alleged discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. sections 12132 and 12203(a), violations of Georgia Code sections 30-5-3, 30-3-1, and 51-

9

1-6, and intentional infliction of emotional distress. After discovery closed, the district court entered summary judgment against Higdon's complaint. She now appeals the judgment against her retaliation claims against McMichael and Eberhardt in their individual capacities and her state law claims for violation of section 51-1-6 and intentional infliction of emotion distress against all the defendants.

## II.  STANDARD OF REVIEW

We review a grant of summary judgment de novo. See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). We view the record and draw all reasonable inferences in the light most favorable to the non-moving party. See id. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). A genuine factual dispute exists "if the jury could return a verdict for the non-moving party." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc)).

## III.  DISCUSSION

On the same day the district court entered summary judgment, this Court

10

decided Shotz v. City of Plantation, Fla., 344 F.3d 1161 (11th Cir. 2003), and held that the anti-retaliation provision of the ADA "establishes individual liability for a violation of its prohibitions, where the 'act or practice' opposed is one made unlawful by Subchapter II." Id. at 1164. The contrary holding of the district court, therefore, was error. Because we may affirm the judgment of the district court on any ground that finds support in the record, Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001), we address the merits of Higdon's retaliation claims. We then address her claims under state law.

### A. ADA Retaliation Claims Against McMichael and Eberhardt

We typically examine whether a plaintiff has established a prima facie case of retaliation under the ADA in the employment context, but the ADA also recognizes retaliation claims outside the employment context. See 42 U.S.C. § 12203(a). The anti-retaliation provision of the ADA prohibits discrimination against an individual because that individual "opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" conducted under the statute. Id. (emphasis added). This provision allows a complaint of retaliation against a public entity or its employees governed by Title II in the same manner that this provision allows a complaint of retaliation against

11

an employer under Title I.  Shotz, 344 F.3d at 1181 n.3.

To establish a prima facie case of retaliation under the ADA, "a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse . . . action; and (3) the adverse action was causally related to the protected expression."  Id. at 1180 (quoting Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002)).  The failure to satisfy any of these elements is fatal to a complaint of retaliation. We consider Higdon's evidence of the second and third elements and conclude that Higdon failed to establish a prima facie case of retaliation against either McMichael or Eberhardt.

### 1. Adverse Action

In Shotz, this Court, with the guidance of employment case law, examined the second element of a prima facie case of retaliation under Title II of the ADA: adverse action.  344 F.3d at 1181-84.  In defining an adverse action, Shotz explained that the ADA is not a code of civility, and allegations of adverse actions must be considered under both an objection and subjective standard:

> Indeed, not "every unkind act" is sufficiently adverse.  Rather, we analyze that sufficiency "on a case-by-case basis, using both a subjective and objective standard.  As a general rule, "[a]n ADA plaintiff must demonstrate that a reasonable person in his position would view the . . . action in question as adverse.  We have said that "[a]n employment action is considered 'adverse' only if it results in some tangible, negative effect . . . .

12

> [W]hile conduct must be material to be adverse in this context, it need not be traumatic. If we set the bar too high, we run the risk of chilling legitimate opposition to unlawful and discriminatory practices, and "could stifle [a person's] willingness to file charges of discrimination."

Shotz, 344 F.3d at 1181, 1182-83 (citations omitted). We have explained that "an employment action . . . is not adverse merely because the employee dislikes it or disagrees with it," and "not everything that makes an employee unhappy is an actionable adverse action." Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (citations and quotations omitted). An adverse action must meet a "threshold level of substantiality" before it can serve as the basis of a retaliation claim. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998).

In support of her argument that she suffered an adverse action, Higdon contends that, on separate occasions, Eberhardt and McMichael retaliated against Higdon. First, Higdon complains that she suffered an adverse action when Eberhardt approached Higdon on several occasions and, in front of other customers, accused Higdon of not coming to the Trade Port office on the correct day and told Higdon that the employees were watching her. Second, Higdon complains that McMichael bumped her car into Higdon's car while Higdon was waiting in a line at a bank.

13

Eberhardt's conduct does not rise to the level of an adverse action. Higdon's evidence shows a contentious relationship with Eberhardt, but there was no "tangible negative effect" on Higdon. Lucas, 257 F.3d at 1261. Higdon testified that, after Eberhardt reviewed her paperwork, Higdon was allowed to stay at the Trade Port office, and Eberhardt never prevented Higdon from processing her titles. Higdon alleges that Eberhardt was rude, but this Court has repeatedly stated that the civil rights laws were not intended to be a "civility code." See, e.g., Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). Higdon's complaint of retaliation against Eberhardt fails.

McMichael's alleged actions present a closer question. Higdon contends that McMichael's car bumped her car while Higdon was waiting in line at the bank. After examining her car, Higdon stated that she recognized McMichael and approached the driver's side of McMichael's car. Higdon testified that McMichael made eye contact, only stared at her, and did not say anything. It is undisputed that there was no damage to either Higdon's car or McMichael's car. Because Higdon's complaint involves an alleged battery, although a minor one, we will assume, without deciding, that this incident constitutes an adverse action. We turn next to the third element of a prima facie case of retaliation: causal relationship.

14

## 2. Causal Relation

We construe the causal link element broadly so that "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). "A plaintiff satisfies this element if [s]he provides sufficient evidence" of knowledge of the protected expression and "that there was a close temporal proximity between this awareness and the adverse . . . action." Shotz, 344 F.3d at 1180 n.3 (quoting Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1337). A "close temporal proximity" between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. See Olmstead, 141 F.3d at 1460. We have held that a period as much as one month between the protected expression and the adverse action is not too protracted. See Wideman, 141 F.3d at 1457 (citing Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986)).

The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (citations omitted). The Court cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal

15

connection.  See id. (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and Hughes v. Derwinski, 967 F.2d 1168, 1174-45 (7th Cir. 1992) (4-month period insufficient)).  If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.  In Wascura v. City of South Miami, we held that "Wascura failed to present evidence from which a reasonable jury could find any causal connection between Wascura's notice to the Commissioners in January 1995 of her potential need to take time off to care for her son and her subsequent termination on May 16, 1995."  257 F.3d 1238, 1248 (11th Cir. 2001).

McMichael had knowledge of the protected expression when she received the September 29, 1999, letter from Higdon's attorney, but the incident of car bumping occurred on December 31, 1999, three months after the letter was mailed.  Although she testified that she believed that the act was intentional, Higdon admitted that she did not have any evidence that McMicheal intentionally hit her.  Instead, Higdon stated that she thought the event was ironic.

By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.  See Clark County Sch.

16

Dist., 532 U.S. at 273, 121 S. Ct. at 1511.  Aside from the three month temporal proximity, Higdon has not presented any other evidence of causation.  There is no evidence in the record that McMicheal even knew that Higdon's car was in front of her car in the bank line.  Higdon, therefore, cannot establish that her protected expression and the adverse action were causally related.  Because Higdon cannot establish a prima facie case of retaliation under Title II of the ADA, the district court properly entered summary judgment against Higdon's claim of retaliation.

## B.  State Law Claims Against All Defendants

Before we address the merits of her state law claims, we reject Higdon's contention that the district court did not have jurisdiction over her state law claims after it granted summary judgment on her federal claims.  Federal courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form a part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Although a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), the court may continue to exercise supplemental jurisdiction even after the federal claims are dismissed.  See, e.g., Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir.

17

1999); <u>Bakers v. Farmers Elec. Co-op., Inc.</u>, 34 F.3d 274, 283 (5th Cir. 1994).

Higdon asserts two state law claims against the defendants. She first contends that the district court erred when it dismissed her section 51-1-6 claim as duplicative of her ADA claim. She next contends that the district court erred in dismissing her intentional infliction of emotional distress claim. We address each argument in turn.

### 1. Georgia Code Section 51-1-6

Georgia Code Annotated section 51-1-6 states "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." Ga. Code Ann. § 51-1-6. The section "provides for recovery of damages upon breach of a legal duty and specifies that the requirement under the law to perform or refrain from doing an act must be for the benefit of the injured person." <u>Dupree v. Keller Indus.</u>, 404 S.E.2d 291, 294 (Ga. Ct. App. 1991). To recover on a claim of breach of statutory duty, the person complaining of the breach must be within the class for whose benefit the statute was enacted. <u>See</u> <u>Spivey v. Sellers</u>, 363 S.E.2d 856, 858-59 (Ga. Ct. App. 1987).

Section 51-1-6 allows an individual to assert a tort claim for the violation of

a legal duty where a cause of action does not otherwise exist. Higdon contends that the defendants' alleged violation of the ADA provides her a cause of action under section 51-1-6. The breach of the legal duty Higdon "seeks to rely on here is one where an express cause of action already exists as part of a remedial scheme under . . . the ADA." Cruet v. Emory Univ., 85 F. Supp. 2d 1353, 1354 (N.D. Ga. 2000). Title II of the ADA provides a cause of action for Higdon, and she asserted that claim. Section 51-1-6 does not allow her to pursue duplicative remedies for an alleged violation of federal law. See id. The district court, therefore, properly entered summary judgment against Higdon's claim under section 51-1-6.

## 2. Intentional Infliction of Emotional Distress

To recover for intentional infliction of emotional distress under Georgia law, Higdon must prove four elements: (1) that the defendants engaged in intentional or reckless conduct; (2) that the conduct was extreme and outrageous; (3) that there is a causal connection between the wrongful conduct and Higdon's emotional distress; and (4) that her emotional distress is severe. See Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835, 837-38 (Ga. 1991). Whether a claim rises to the requisite level of outrageousness and egregiousness is a question of law for the court. See id. Liability has been found only where the defendant's conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be

19

regarded as atrocious, and utterly intolerable in a civilized society." Kaiser v. Tara

Ford, Inc., 564 S.E.2d 861, 868 (Ga. Ct. App. 2001).

Higdon complains that the following conduct was outrageous: (1)

McMichael did not allow Higdon to go to the handicapped window, but made

Higdon wait in the longer line for commercial title processors; (2) McMichael,

Dufford, Eberhardt and Jackson allegedly knew that Higdon was suffering while

waiting in line and still did not allow her to use the handicapped window; (3)

McMichael allegedly "ran her car into Ms. Higdon's car without so much as an

apology, joked about it, and exchanged e-mails with another employee explaining

that Ms. Higdon would not be invited to use the disabled window"and (4)

Eberhardt allegedly spoke to Higdon in a derogatory and condescending manner

and twice asked Higdon if she was conducting business on the correct day. As the

district court found, this conduct "at its worst constitutes 'tasteless and rude social

conduct.'" The alleged actions of the defendants do not, however, come close to

the level of "extreme and outrageous" conduct. The district court, therefore,

properly entered summary judgment against Higdon's claim of intentional

infliction of emotional distress.

## V. CONCLUSION

Because Higdon failed to establish that she suffered an adverse action based

20

on Eberhardt's rude behavior and a causal relation between the car bumping with McMichael and Higdon's complaint of discrimination, Higdon cannot establish a prima facie case of retaliation under Title II of the ADA against Eberhardt or McMichael. We, therefore, affirm the summary judgment entered against her retaliation claim. We also affirm the summary judgment entered against Higdon's claims under state law.

**AFFIRMED.**