[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2005
THOMAS K. KAHN
CLERK

No. 04-12973

D.C. Docket No. 01-00083-CV-5

FREDDY GREEN,

Plaintiff-Appellant,

versus

ELIXIR INDUSTRIES, INC.,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Georgia

————————————————

**(April 29, 2005)**

Before BARKETT, HILL and FARRIS[*], Circuit Judges.

FARRIS, Circuit Judge:

In this appeal we decide whether a claim for hostile work environment

———————————

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

discrimination was adequately stated to the EEOC and met the summary judgment standard. It was, and it did. We therefore reverse and remand for further proceedings.

## BACKGROUND

Plaintiff Freddy Green is a black male who was employed by Defendant Elixir Industries, Inc. in 1995 in its second shift paint line at Elixir's Georgia Extrusion Division in Douglas, Georgia. Elixir produces extruded and manufactured aluminum parts for manufactured housing and recreational vehicle industry supplies. Elixir's employees work on two shifts of varying hours. Green's primary duties when he was first hired were to hang metal that was to be painted. After 90 days, Green was transferred at his request to the second shift fabrication department. His duties then included operating a miter saw, running presses and drills, and ensuring the proper preparation of dyes. On August 7, 2000, Green was transferred to the first shift fabrication department as part of a reduction in force which terminated almost all second shift employees.

In each job classification (including the paint department and fabrication department) an employee would receive pay raises at three-month, nine-month, and one-year intervals. After one year, an employee was only eligible for merit-based pay raises, based on a supervisor's recommendation, on the anniversary of

2

the start of employment.

Though a person in Green's position normally reached the top wage for his classification after one year of employment, Green did not. He complained to his supervisor, Stanley Wilcox, a black male, that he was receiving only $8.37 per hour, while white and Hispanic employees were receiving $9.01 per hour. Wilcox did not respond to the complaint but after Green complained to a white supervisor his wage was increased to $9.01. Green never received any merit increases thereafter.

Green alleges that, throughout his employment at Elixir, he was subjected to repeated and intense acts of racially motivated harassment. At some time in 1998, a hangman's noose was hung on equipment in the fabrication department and remained there for approximately a week. On April 19, 2000, Clay Hutchinson, a white employee, made a noose and displayed it, allegedly in an attempt to intimidate Wilcox. Hutchinson was allegedly angry because Wilcox was involved romantically in an interracial relationship with a woman in whom Hutchinson was interested. Several Elixir employees expressed disdain for interracial relationships, and Charles Hutchinson, Clay's brother, is alleged to have told Green that race mixing is "against the Bible." Green's common law spouse is white.

3

On May 26, 2000, Green alleges that a third noose appeared. This noose was made by Jack Dixon, a white employee and the nephew of the production manager at Elixir, Jacel Butler. Mr. Dixon allegedly made the noose because he was upset at the possibility that the Confederate battle emblem would be removed from the Georgia state flag. Green observed Dixon make the noose and heard him say, "How would y'all like it if we sent all of y'all back to Africa?" and "If y'all take the flag down, all of y'all need to be sent back to Africa." Green complained about this incident to Wilcox, who stated that he could do nothing about it.

On another occasion, Green observed a number of white employees looking at a computer screen that displayed a Ku Klux Klan website and overheard these employees discussing that a number of Elixir employees were members of various chapters of the KKK. Green complained about this incident to Wilcox and to Steve Parks, a white management level employee, who stated that he would look into the matter. According to Green, nothing occurred thereafter.

At a meeting of second shift workers (almost all of whom were black), production manager Jacel Butler is alleged to have stated, "I can take a monkey and give him a banana to push a button," and "If y'all don't want to work, I can go to Cozy Corner and get drunks to replace you." Green testified that Cozy Corner is a local black club. After this meeting, a sign was placed in an office window

4

visible to all employees that stated, "Please don't feed the monkeys."

According to the testimony of Dwight Dennis, a former black employee at Elixir who also filed a lawsuit against Elixir for hostile work environment race discrimination at roughly the same time as this action, production manager Butler issued a rule that no family members would be allowed inside the plant. Dennis testified that the rule was not enforced in the first shift, which was composed of mostly white employees. On the second shift, however, the rule was rigorously enforced.

There is also evidence that at several points in his employment, Green was disciplined for attendance policy violations. On three occasions, he was suspended for three days without pay for failing to report for work.

During the week of Christmas, Elixir often closed the plant and operated with only a skeleton crew. Employees were given the choice to work with the skeleton crew if they wished. In 2000, the plant closed from December 26-29, and Green did not work on those days. During that time, Green and his wife were shopping in a local store and were seen by production manager Butler. Green testified that when Butler saw him and his wife together, Butler took "his buggy and push[ed] [it] back down the aisle and [stood] there and stare[d] at us, just looking out like he was losing his mind."

5

On January 2, 2001, Green returned to work. After working for six hours, he was approached by Butler, who told him that he was fired. Butler's reason was that Green had volunteered to work from December 26-28 with the skeleton crew and had failed to call in to state that he would not come. Green contends that his name was not posted to work on those days, that he never volunteered, and that no one let him know that he was expected to work on those days.

On March 28, 2001, Green filed pro se a charge of discrimination with the EEOC. Green checked the box stating that the discrimination alleged was racial. In the box where Green was required to state the dates of the discrimination, Green wrote "January 2, 2001" as the "earliest" and "latest" dates. In the factual particulars section, Green stated:

> I. I was employed from March 7, 1995 until my discharge January 2, 2001. I was terminated for violation of the attendance policy, but I have no written warnings for attendance. White males that have written warnings and have committed further violations were not terminated.
>
> II. Management stated I was discharged because of violation of the attendance policy.
>
> III. I believe that I have been discriminated against because of my race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended.

The EEOC investigated Green's charges and concluded that Green was not terminated because of his race. It issued Green a right to sue notice. Green

6

subsequently filed this action.

Green brought claims for violation of his rights pursuant to 42 U.S.C. § 2000(e) (Title VII) and 42 U.S.C. § 1981, for both wrongful termination on the basis of race and hostile work environment race discrimination. Defendant moved for summary judgment, and the district court denied the motion as to the wrongful termination claim. That claim was tried to a jury, which returned a verdict for the defendant. The district court found the evidence sufficient to withstand summary judgment on the hostile work environment claim,[1] but accepted the defendant's argument that the EEOC charge was procedurally deficient as to this claim. The court gave Green fifteen days to respond to defendant's argument.

Green filed a brief and affidavit in response. In the affidavit, Green stated that he spoke to an EEOC investigator and told him about the harassing conduct. He also testified that he provided paperwork to the EEOC detailing these incidents and that he believed that the incidents of harassment would be included in his EEOC charge. Green's counsel stated that he attempted to obtain Green's file from the EEOC, but was advised by the EEOC that the file had been destroyed. The district court rejected Green's arguments and entered summary judgment on

---

[1]The court granted summary judgment for defendant on Green's claim for punitive damages as to the hostile work environment claim. That issue has not been appealed.

the hostile work environment claim for defendant.

Green filed a motion for reconsideration of this ruling. He called attention to a companion case, *Dennis v. Elixir*, No. CV501-84, in which Green's colleague, Dwight Dennis, had filed a pro se complaint of racial harassment against Elixir, in the same court and before the same judge. Elixir raised precisely the same issue in *Dennis*, arguing that an alleged procedural deficiency in the EEOC charge with respect to allegations of workplace harassment barred the claim. Dennis, however, was able to obtain and produce written documents that he presented a hostile work environment claim to the EEOC (though not on the charge itself) before the agency destroyed his file. The district court distinguished Green's situation, calling Green's affidavit "self-serving" and noting that Green had been unable to produce any paperwork from the EEOC. The court denied the motion for reconsideration.

## STANDARD OF REVIEW

We review the grant of summary judgment de novo. *Higdon v. Jackson*, 393 F.3d 1211, 1218 (11th Cir. 2004).

## ANALYSIS

The issue is whether, in the face of evidence of hostile work environment discrimination, the fact that Green's EEOC charge did not contain specific

8

allegations of hostile work environment discrimination bars that claim.

"Prior to filing a Title VII action . . . a plaintiff first must file a charge of discrimination with the EEOC." *Gregory v. Georgia Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). The purpose of this requirement is that the EEOC "should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.* Equally important, the charge requirement serves to notify the employer of the allegations made against it. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1319 (11th Cir. 2001). These policy concerns have moved us to hold that a plaintiff's complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280 (internal citation omitted). Nevertheless, courts must be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Id.*; *see Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 461-62 (5th Cir. 1970) (emphasizing the "humanitarian underpinnings of Title VII and the crucial role played by the private litigant in the statutory scheme").

There is no dispute that the three statements in Green's EEOC charge emphasize Green's termination as the central discriminatory act. The charge also

9

lists January 2, 2001, as the starting and ending date of the discriminatory conduct. However, this does not necessarily bar Green's hostile work environment claim. In *Sanchez*, a case on which both parties rely, we rejected the defendant-employer's arguments that the plaintiff's claims based on national origin discrimination were barred because she checked the box on the EEOC charge marked "sex" rather than "national origin." 431 F.2d at 461. We stated: "In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations." Likewise, the fact that Green responded on the charge with a single date when asked when the discrimination occurred does not mean that his harassment claims are barred. Knowing which acts constitute discriminatory conduct and which are offensive and harassing, but not per se actionable, requires legal training, which Green did not possess. *Sanchez's* reasoning applies with equal force here.

Defendant attempts to distinguish *Sanchez* by pointing out that the facts set forth by Green in the charge did not give Elixir notice that he intended to bring a hostile work environment claim. This, however, is very much akin to the argument made by the *Sanchez* defendant: "Certainly it is not unreasonable to require a charging party promptly to articulate the reason why he thinks he is

10

being treated unfairly by an employer." *Id.* at 462. We rejected this argument for three reasons, all of which are relevant here:

> First, the charging party may have precise knowledge of the facts concerning the 'unfair thing' done to him, yet not be fully aware of the employer's motivation for perpetrating the 'unfair thing.' Secondly, the charging party may be so unlettered and inarticulate that he does not fully comprehend the distinction between an act motivated by 'sex discrimination' and an identical act motivated by 'national origin discrimination.' Finally, the charging party may simply be unschooled and unsophisticated in the use of forms. Should a charging party forfeit his cause of action for reasons such as these? We think not.

*Id.* at 462-63. Whatever Green's level of education, there is no question that he should not be held to the level of understanding the distinctive legal nuances between claims that constitute hostile work environment discrimination and those instead which constitute wrongful termination based on race. Like Ms. Sanchez, Green filed his charge of discrimination pro se. Green even stated, in a distinct factual allegation, that he was "discriminated against because of [his] race." This allegation contains no reference to his termination; it is simply an unqualified statement, standing alone, of race discrimination. "It would falsify [Title VII's] hopes to require verbal precision and finesse from those to be protected . . . ." *Sanchez*, 431 F.2d at 465.

Our recent holding in *Gregory v. Georgia Dep't of Human Resources*, 355 F.3d 1277 (11th Cir. 2004) is of some assistance. There, plaintiff Gregory, a

11

physician, alleged that she had been terminated for "no legitimate reason." She marked the spaces on the charge for "gender and race discrimination" and left the "retaliation" space blank. She also stated that she "believe[d] that [she] had been discriminated against on the basis of my race (Black American) and my sex (female)." *Id.* at 1279.

After receiving her right to sue notice from the EEOC, Gregory asserted in her complaint that her termination was motivated by her race and was in retaliation for her complaints about her supervisor's conduct. *Id.* Defendant argued that her allegations of retaliation were administratively barred because she had only alleged race discrimination in her EEOC charge. The district court disagreed and we affirmed:

> After a careful *de novo* reading of Dr. Gregory's EEOC charge prepared without the assistance of counsel, and under the liberal EEOC charge strictures of *Sanchez*, we hold that the district court did not err in finding that Dr. Gregory's retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form. The facts alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination. That is, she stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation.

*Id.* at 1280. The proper inquiry, as these cases make clear, is whether the complaint is "like or related to, or grew out of" the allegations in the EEOC

12

charge. *Id.*

That the facts involving Green's harassment and termination claims are "inextricably intertwined" has already been established. At trial on his wrongful termination claim, Green was permitted to introduce evidence of racial harassment while at Elixir, including evidence of the three hangman's nooses. The reason that such evidence was permitted, plainly, is that it was relevant to his allegation of wrongful termination. Thus, if that evidence was relevant to, or related to, his case at trial, it should likewise be "related to" or "like" the evidence and allegations of harassment.

The policies supporting the EEOC charge requirement support this conclusion as well. One of the primary purposes for the charge requirement is to provide notice to the employer of the allegations against it. *Wilkerson*, 270 F.3d at 1319. Here, the evidence of racial harassment, if believed (as it must be on summary judgment review), is so substantial that Elixir should already have been on notice of the problems at its plant. Many of Green's allegations directly involve management-level employees at Elixir. Elixir had, or should have had, ample notice of the racially hostile working conditions at its plant. It is disingenuous for Elixir to plead ignorance because Green did not include each specific act of harassment on his EEOC charge.

13

Defendant relies heavily on *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668 (8th Cir. 1994), but that case can be distinguished in a way that demonstrates the fallacy of defendant's argument. In *Tart*, an employee stated on her administrative form that she had been wrongfully terminated. In her complaint, however, she included allegations that she had been racially harassed, and the court held that her harassment allegations were barred. *Id.* at 672-73. Crucial to the Eighth Circuit's ruling, however, was the following conclusion:

> In this case, the record demonstrates that Patrick Behan was solely responsible for the decision to terminate Tart, and Tart's discriminatory discharge claim turned upon the subjective motivation of Patrick Behan. The incidents of alleged racial harassment by coworkers are distinct from and unrelated to the . . . incident which resulted in . . . [the] decision to discharge Tart . . . . *Furthermore, the conduct of co-employees throughout Tart's 11-year employment with [defendant] offers little if any insight into Patrick Behan's motivation for terminating Tart . . . . We therefore conclude that Tart's racial harassment claim is not sufficiently like or related to his complaint of discriminatory discharge . . . .*

*Id.* (emphasis supplied).

Here, by sharp contrast, the individual responsible for terminating Green, Jacel Butler, was intimately familiar with the allegedly harassing conduct complained of by Green. In fact, he was allegedly responsible for much of that conduct himself. The evidence supporting Green's hostile work environment and wrongful termination claims is "inextricably intertwined," *Gregory*, 355 F.3d at

14

1280, in that the same man is in large measure allegedly responsible for both. Faced with these facts, a reasonable EEOC investigator could have concluded that Green's complaints involved allegations of racial harassment. *See id.*

We take no position on the merits of Green's claim of hostile work environment race discrimination. That is for the trier of fact to determine. We merely hold that, on this record, Green stated enough on his EEOC charge to warrant an investigation of hostile work environment discrimination at Elixir. We also hold that Green has raised a genuine issue of material fact with respect to this claim, which precludes summary judgment for the defendant. It is inconsistent with Title VII's expansive remedial aims to prevent Green's racial harassment claim from proceeding to trial because Green's statements on an administrative form might have been more exhaustive.[2]

**REVERSED AND REMANDED.**

---

[2]Green also appears to argue that he should be permitted to "retry the case as a whole with the claim of racial harassment included therein." We reject this claim. The jury found for defendant on the wrongful termination claim. Judgment on that verdict has not been appealed.

HILL, Circuit Judge, dissenting:

Today, the majority holds that a plaintiff's failure to allege facts sufficient to inform the EEOC that he complained of hostile work environment as well as wrongful termination is a "procedural technicality" that cannot be allowed to bar a subsequent Title VII claim. Although conceding that Green's EEOC charge does not allege a single *fact* that reasonably could have been expected to prompt the EEOC to investigate a charge of hostile work environment,[1] the majority characterizes this as a failure to articulate a correct legal conclusion emanating from his factual allegations, and then excuses this failure as the result of Green's lack of legal training. Respectfully, I cannot concur in this characterization of the record in this case.

Furthermore, I cannot concur in the majority's conclusion that Green's assertion that he was "discriminated against because of [his] race," constitutes a factual allegation sufficient to support hostile work environment claim. Such an allegation, then, by itself, and without more, would support any conceivable judicial discrimination claim and render the requirement to exhaust ones claims in the EEOC totally irrelevant.

---

[1]Green's charge complained only of his termination. Additionally, he defined the relevant time period of the discriminatory conduct as the single day on which he was fired.

16

We have indeed traveled a long way down the road that permits us to liberally construe the factual allegations of a plaintiff's EEOC charge in determining what claims were fairly raised there. But I am unaware of any case that, heretofore, permitted us to conclude that a claim was fairly raised in the absence of a single factual allegation that would support such an inference. Therefore, I must respectfully dissent.[2]

---

[2] In *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, relied upon by our panel here, the failure of the employee to present to the EEOC a full statement of his complaint is referred to on each and every page of the decision (Parts II, III, IV and V) as a "technicality." Perhaps my view is informed by my own experience as a young (what a memory!) lawyer, complaining that the point advanced against my position by opposing counsel was "a mere technicality." The very fine judge presiding looked at me, kindly but positively, and said, "Mr. Hill, a technicality is a point of law upon which you lose. If you win on it, it is a cornerstone of American jurisprudence!"