[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 27, 2007
THOMAS K. KAHN
CLERK

No. 07-10196
Non-Argument Calendar
_____

D. C. Docket No. 05-00185-CV-4-WS-WCS

ELIZABETH A. NICHOLS,

Plaintiff-Appellant,

versus

CSG SYSTEMS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(August 27, 2007)**

Before BLACK, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Elizabeth Nichols appeals the district court's order granting summary

judgment in favor of her employer, CSG Systems, Inc. (CSG), in a retaliation suit she brought pursuant to Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-3. Nichols alleges that CSG engaged in two retaliatory acts against her as a result of adverse testimony she gave in a co-worker's lawsuit against CSG. For the reasons set forth below, we affirm.

## I.

CSG provides customer care and billing services for the cable television, direct broadcast satellite, high-speed internet, and IP services markets. Nichols has worked on the production floor of CSG's facility in Crawfordville, Florida since May 2000.

The starting point for this case is May 27, 2003. According to Nichols, she was approached on that date by Kim Tucker, one of CSG's human resource officers, who told her two things. First, Tucker informed Nichols that on the next day, May 28, she would be giving deposition testimony in a case brought against CSG by one of Nichols' co-workers. And second, Tucker encouraged Nichols to "remember" in her testimony that CSG does not offer light-duty work. Nichols disagreed with Tucker's statement about light-duty work, stating "yes, we do." She further informed Nichols that she intended to be honest in her testimony and to answer all deposition questions to the best of her ability. Nichols claims that

2

Tucker then became visibly upset.

The following day, Nichols was deposed and testified against CSG's position that there was no light duty work available. Nichols asserts that from that point forward Tucker stopped talking to her and displayed a hostile attitude toward her, although Nichols does not cite any specific examples of Tucker's hostility and maintains that they did not have any further job-related interactions for almost ten months after the deposition.

In February 2004, Nichols learned that she was pregnant. Her pregnancy was considered high risk; she had previously miscarried and was taking medication to prevent a repeat. Her doctor advised her that she should avoid working in areas with excess dust and print toner—both of which were prevalent on CSG's production floor. In her affidavit Nichols described the production floor as containing "a heavy concentration of dust particles" and noted that "you can see the dust in that work area daily."

Concerns about the risks of working on the production floor prompted Nichols to seek work in a different part of CSG's Crawfordville facility. In early March 2004, Nichols informed Tucker of her pregnancy and gave Tucker a note from her doctor stating "we recommend that [Nichols] be put in a position away from excess dust, i.e., office work." Immediately after giving the note to Tucker,

3

the pair discussed the possibility that Nichols could be assigned to work in a light-duty position. Based on her personal knowledge of the Crawfordville facility, Nichols felt she could work safely in another division, such as the postal administration service (PAS), central express service, or the office and reception area. According to Nichols, when she approached Tucker she knew that she was qualified to work in one of those areas and that CSG had hired temporary employees to fill those positions.

Tucker immediately discussed Nichols' situation with CSG's director of operations, Tommy York, who told Tucker that he was uncertain whether Nichols could work in any capacity during her pregnancy because CSG's facility is fully inclosed and uses an air conditioning system that re-circulates all air internally. CSG requested additional information from Nichols' physician describing what he meant by the term "excess dust." In the meantime she was assigned to work in the PAS, an area that apparently had much lower levels of dust than the production floor.

Over the next week Nichols submitted two additional forms completed by her doctor. The forms were not specific, stating only that "[Nichols] needs a work environment away from the paper dust and toner of her current duties" and "[r]ecommended she not work on production floor and print shop. Can work in

4

other areas."[1] After receiving the follow-up reports, Tucker and York consulted with Vikki Jaeger, CSG's director of human resources, and determined that there were no CSG positions, light duty or otherwise, that would comply with Nichols' restrictions.

On March 15, 2004, Tucker advised Nichols that she needed to go home because their was "no work" for her in PAS. Tucker further advised Nichols that she would not be able to work for CSG during her pregnancy because all CSG positions involve exposure to paper toner and dust. Tucker then provided Nichols with FMLA paperwork, which Nichols begrudgingly completed. Nichols was on unpaid FMLA leave from March 16 to December 19, 2004.

In February 2005, two months after returning from FMLA leave, Nichols

---

[1] There is a factual dispute between the parties about a 2003 air quality study that was commissioned by CSG. The study evaluated the quality of the air on the production floor, and indicated that the dust on the production floor did not pose a serious health risk to the employees working on the production floor. Tucker and York stated in affidavits that Nichols had been given a copy of the study to give to her doctor. Nichols denies ever receiving the study before discovery occurred in this case. In her brief, Nichols also implies that she may have considered working on the production floor if she had been aware of the study at the time she was forced to take FMLA leave. However, Nichols did not make that argument to the district court, and we will not consider it for the first time on appeal. See Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1307 n.2 (11th Cir. 2007). Furthermore, because the study pertained only to the production floor, and Nichols' contention is that CSG retaliated against her by refusing to give her work in places other than the production floor, whether she in fact received the study is not relevant to her claim that she was denied work in other parts of CSG's facility, because she clearly sought temporary work in other parts of the facility and did not want to work on the production floor. See Nichols Aff. 6 ¶ 17 ("Even if I had been provided with a copy of [the 2003] study, the study only pertained to the production floor and not to the areas of CSG where I was trying to work, . . .").

5

was informed by her doctor that she needed surgery to remove an ovarian cyst. Nichols requested and was initially approved for FMLA leave to have the surgery. But a problem quickly arose. Upon reviewing Nichols' FMLA paperwork, CSG's payroll department discovered that Nichols was ineligible for FMLA leave because she had not worked at least 1250 hours in the preceding 12 months. See 29 U.S.C. § 2611(2)(A). Instead of FMLA leave Nichols received an authorized personal leave of absence to have the surgery. After the cyst-removal surgery was completed, Nichols' doctor advised her that she needed to have one of her ovaries removed. CSG granted Nichols more personal leave time to have that surgery.

When she returned from her second surgery Nichols informed Tucker that she needed a hysterectomy, a surgical procedure that would require her to miss up to six more weeks of work. Tucker then informed Nichols that she would be terminated if she had the operation because: (1) she had not yet accrued enough hours worked to qualify for FMLA leave; (2) she had exhausted her personal leave time; and (3) she would create a significant work-flow disruption by taking a six-week absence. Tucker did, however, tell Nichols that she could re-apply to CSG when her doctor cleared her to return to work. Nichols decided to postpone the hysterectomy until August 2005, when she had accumulated the necessary 1250 hours to qualify for FMLA leave. She then took the leave, underwent the surgery,

and returned to work at CSG in September 2005 and remains employed there today.

In April 2004, Nichols filed a charge with the Florida Commission on Human Relations alleging that by forcing her to take FMLA leave during her pregnancy CSG was, among other things, retaliating against her for her May 2003 testimony on behalf of her co-worker. The state agency investigated the charges and issued a "no cause" determination, which was later adopted by the Equal Employment Opportunity Commission. Thereafter, in April 2005, Nichols filed this lawsuit against CSG. On December 12, 2006, the district court granted CSG's motion for summary judgment.

## II.

Nichols' first contention on appeal is that summary judgment was inappropriate because the circumstantial evidence she put forth would be sufficient for a rational factfinder to conclude that CSG forced her to take FMLA leave instead of assigning her to a different work area during her pregnancy in retaliation for her May 2003 testimony. The circumstantial evidence that Nichols cites includes: (1) Tucker's allegedly hostile attitude toward her after her May 2003 testimony; and (2) the fact that CSG's decision in March 2004 to force her to take FMLA leave was the first opportunity that Tucker had to retaliate against her for

7

her May 2003 testimony.

We review an order granting summary judgment de novo, applying the same legal standard as the district court, and "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Although we construe all reasonable inferences in the light most favorable to the non-moving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find . . . by a preponderance of the evidence that the plaintiff is entitled to a verdict." Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1184 (11th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986)). In a Title VII case summary judgment is appropriate if a plaintiff fails to prove an element of her prima facie case. Id. at 1180.

To prove discriminatory retaliation through circumstantial evidence, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events. Drago, 453 F.3d at 1307. "Only after the plaintiff makes

8

this prima facie case of discriminatory retaliation does the burden shift to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Id. Should the defendant carry the burden of production by offering legitimate reasons for the action, "the presumption raised by the prima facie case is rebutted[ ] and drops from the case." Id. (citation and quotation marks omitted). At that point, the burden remains with the employee to prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for retaliation. Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 715 (11th Cir. 2002).

In its response brief CSG does not dispute that Nichols' testimony was a protected activity or that placing her on FMLA leave instead of granting her request for reassignment to a different work area could constitute an adverse employment action. Instead CSG argues that Nichols has not put forth sufficient evidence to show a causal link between her being denied reassignment and her May 2003 testimony.

A causal connection can be demonstrated by presenting evidence that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." Shannon, 292 F.3d at 716 (citation and quotation marks omitted). We construe the causal link element

9

broadly. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Although close temporal proximity can indicate causation, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001).

In Clark County, the plaintiff "rel[ied] wholly on the temporal proximity . . . of her complaint" and the alleged adverse employment decision and did not present any other evidence of causation. Id. at 272–73, 121 S. Ct. 1510–11. In light of Clark County, we have held that "in the absence of any other evidence of causation," a three-month proximity "between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." Drago, 453 F.3d at 1308; see also Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."); Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that, by itself, three and one-half months was insufficient to prove causation).

10

Here, it would be impossible for a rational factfinder to infer retaliation based on the evidence Nichols has offered. First, there is no inference of retaliation that arises from temporal proximity because nearly ten months passed between the time of Nichols' deposition and CSG's decision to place Nichols on FMLA leave. See Drago, 453 F.3d at 1308; Higdon, 393 F.3d at 1220; Wascura, 257 F.3d at 1248. Second, although three CSG employees—Tucker, York, and Jaeger—were directly involved in the decision to place Nichols on FMLA leave, Nichols has offered no evidence that either York or Jaeger even knew about the deposition. Third, Nichols has submitted no evidence that other pregnant employees who were subject to similar dust restrictions received different treatment. And fourth, Nichols provides only general observations about Tucker's alleged hostile demeanor towards her. Nichols' declaration that she perceived a change in Tucker's behavior and attitude toward her after her May 2003 testimony, without any specifics, is not more than a scintilla of evidence in support of her retaliation claim. Therefore, we conclude that Nichols has not met her burden to establish a prima facie case.

## IV.

Nichols' second contention—that CSG's failure to grant her FMLA leave in February 2005 constituted a second retaliatory act against her—is contingent upon

11

her first. The reasoning behind Nichols' second contention runs as follows: (1) she was forced to take FMLA leave during her pregnancy from March through December 2004; (2) forcing her to take FMLA leave was an act of retaliation for her May 2003 testimony; (3) she did not accrue any work hours for FMLA purposes while she was on FMLA leave in 2004; (4) her failure to accrue any work hours then rendered her ineligible for FMLA leave when she needed it in February 2005 for her two minor surgeries and her hysterectomy; and (5) she would have accrued enough work hours to qualify for FMLA leave in February 2005 "but for" CSG's retaliatory decision in March 2004 to place her on FMLA leave during her pregnancy.

Initially we note that this claim looks more like a theory for injury sustained by CSG's alleged March 2004 retaliation than it does an independent retaliation claim. But even if we assume that this is an independent retaliation claim, Nichols has not established a prima facie case. Other than her statement that she would have worked enough hours to qualify for FMLA in February 2005 "but for" CSG's decision to place her on FMLA leave in March 2004, Nichols has offered no evidence that CSG's decision to deny her FMLA leave in February 2005 was based on anything other than her lack of accrued hours. It follows that if Nichols cannot establish a causal relationship between CSG's decision to place her on FMLA

12

leave in March 2004 and her May 2003 testimony, she likewise cannot establish a causal relationship between CSG's decision to deny her request for FMLA leave in February 2005 and her May 2003 testimony, because there is no other link between CSG's February 2005 decision and Nichols' May 2003 testimony. Because Nichols has not established a prima facie case of retaliation on her first claim, she also has not established a prima facie case on the second one.

**AFFIRMED.**