**Jonathan DARITY, Plaintiff,**

**v.**

**The MEGA LIFE & HEALTH INSUR-ANCE COMPANY, d/b/a UGA–Association Field Services, Defendant.**

**No. 1:06–cv–2113–WSD.**

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 4, 2008.

Larry Allen Pankey, Miles McGoff & Moore, Atlanta, GA, for Plaintiff.

Danielle Urban, Theresa M. Gallion, Fisher & Phillips, LLP, Tampa, FL, Darren T. Horvath, Rebecca J. Jakubcin, Fisher & Phillips, LLP, Atlanta, GA, for Defendant.

## OPINION AND ORDER

WILLIAM S. DUFFEY, District Judge.

This is a discrimination and retaliation action filed by Plaintiff Jonathan Darity ("Darity") against Defendant the MEGA Life & Health Insurance Company, d/b/a UGA–Association Field Services ("MEGA"). This matter is before the Court on Magistrate Judge Vineyard's Report and Recommendation [39] on MEGA's Motion for Summary Judgment [26].

With respect to portions of the Report and Recommendation to which there is no objection, the Court must conduct a plain error review of the record. *United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir.1983). Neither party has objected to the Report and Recommendation, so the Court reviews it for plain error.

## I. BACKGROUND

### A. Factual Background

The Magistrate Judge's Report and Recommendation includes a detailed discussion of the relevant facts, both in its Factual Background section and throughout the opinion. Neither party objected to the Magistrate Judge's findings of fact and, finding no plain error, they are adopted by the Court.

### B. Procedural History

On September 5, 2006, Darity filed his Complaint ("Complaint") in this action, alleging MEGA discriminated and retaliated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), when it denied him consideration for promotion and when it did not renew his contract. MEGA filed its Answer on November 10, 2006. The parties completed discovery and, on April 30, 2007, MEGA filed its Motion for Summary Judgment ("Mot. for

Summ. J.") [26]. Darity filed his brief in opposition to MEGA's motion on June 1, 2007 ("Resp. to Mot. for Summ. J.") [31], and MEGA replied on June 25, 2007 ("Reply in Support of Mot. for Summ. J.") [36]. On January 8, 2008, the Magistrate Judge issued his Report and Recommendation ("R & R") [39], recommending that the Court grant MEGA's Motion for Summary Judgment.

## II. DISCUSSION

MEGA moved for summary judgment on Darity's Title VII and Section 1981 claims on the grounds that: 1) Darity was an independent contractor and thus not protected under Title VII; and 2) Darity could not establish a *prima facie* case of discrimination under Section 1981, or, in the alternative, cannot demonstrate that MEGA's legitimate, non-discriminatory business reasons for its actions were a pretext for race discrimination or retaliation.[1] Mot. for Summ. J. at 3, 12. The Magistrate Judge, in his R & R, set out the standard for evaluating a motion for summary judgment and discussed the respective burdens of the parties in cases where a plaintiff seeks to prove alleged race discrimination under Section 1981 using direct or circumstantial evidence. The

parties have not objected to the Magistrate Judge's conclusions regarding the summary judgment standard or the parties' respective burdens, and they are adopted by the Court.

The Magistrate Judge recommended granting summary judgment in favor of MEGA on both the discrimination and retaliation claims. With respect to Darity's discrimination claims, the Magistrate Judge correctly assumed, for purposes of the summary judgment motion, that Darity can satisfy a *prima facie* case.[2] The Magistrate Judge held that summary judgment is warranted because Darity could not establish any genuine issues of material fact showing MEGA's legitimate, non-discriminatory reasons for failure to promote or for non-renewal of contract were pretexts for unlawful discrimination. R & R at 9–20; 20–26. The Magistrate Judge reviewed thoroughly Plaintiff's alleged evidence of pretext and concluded this evidence failed to cast sufficient doubt on Defendant's proffered reason to permit a reasonable factfinder to conclude the employer was motivated by racial animus. R & R, p 9–26. The Magistrate Judge also examined in detail each of the six proposed comparators identified by Darity to determine whether any of them were similarly

---

1. The Magistrate Judge noted that Darity did not contest MEGA's argument that he was an independent contractor, but rather contends that even if that were the case, he can proceed with his claims under Section 1981. The court found that Darity appeared to abandon his Title VII claims, and it proceeded to address only his allegations under Section 1981. The court also noted that "[a]s a practical matter, this makes no substantive difference to the Court's ruling on the motion for summary judgment since the analysis is the same under Title VII and § 1981." Report & Recommendation, p 8–9, FN 10 (*citing Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1330 (11th Cir.)). Finding no plain error in the

Magistrate Judge's finding, this Court does the same.

2. "As part of his *prima facie* burden on this claim, Darity would have to show that he was qualified for the position. MEGA argues that, because Darity was not a District Sales Leader at the time of his request for consideration, he was not qualified to fill the Division Sales Leader vacancy [a position of greater seniority than both a District Sales Leader and Darity's then-current position of senior sales agent]. Because this issue is inextricably intertwined with the question of pretext, the undersigned assumes that Darity can meet a *prima facie* burden." R & R, p 13 FN 12 (internal citations omitted).

situated to Darity but treated more favorably. The Magistrate Court found that none of them created an inference that Darity's treatment was based on race. R & R, p 23–26.

As to Darity's claim of retaliation, the Magistrate Judge held that Darity presented insufficient evidence to causally connect any alleged protected activity to any alleged adverse employment action.[3] The Magistrate Court examined Darity's alleged protected activity and MEGA's decision not to promote him under a temporal proximity analysis and found insufficient "close temporal proximity" to establish a causal connection between the two. R & R 29–31. The Magistrate Court also found an overly extensive lapse of time between any alleged protected activity by Darity and MEGA's decision not to renew his contract, thus failing to create any inference of causal connection.

The Magistrate Judge's decision is thorough and well-reasoned, and his analysis is adopted by the Court.

## III. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED that the Court ADOPTS the Magistrate Judge's Report and Recommendation with regards to its recommendation that Defendant's Motion for Summary Judgment be granted. Accordingly, Defendant's Motion for

Summary Judgment is GRANTED, and the Clerk of Court is DIRECTED to enter judgment in favor of Defendant.

SO ORDERED.

IT IS SO ORDERED.

JONATHAN DARITY, Plaintiff,

v.

THE MEGA LIFE & HEALTH INSURANCE COMPANY, d/b/a UGA–Association Field Services,[1] Defendant.

### MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

RUSSELL G. VINEYARD, United States Magistrate Judge.

Jonathan Darity ("Darity"), an African–American, brings race discrimination and retaliation claims against the MEGA Life & Health Insurance Company ("MEGA") under the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"). [Doc. 1]. MEGA has filed a motion for summary judgment on all counts, [Doc. 26], which Darity opposes, [Doc. 31]. For the following reasons, the undersigned Magistrate Judge RECOMMENDS that MEGA's motion be GRANTED.

### I. FACTUAL BACKGROUND

In 1996, Darity signed an Independent Insurance Agent Commission Only Con-

---

3. Although the Eleventh Circuit has not defined the elements of a Section 1981 claim, both parties utilize the Title VII framework in analyzing this claim, and the Magistrate Judge in his analysis did the same. R & R, p. 27. See Everson v. Coca–Cola Co., No. 06–15752, 2007 WL 2088839, *1 (11th Cir. July 23, 2007) (citing Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1120 n. 10 (11th Cir.2001)). This Court agrees with the Magistrate Judge's standard of analysis and thus applies the Title VII framework in its review of Darity's retaliation claim under Section 1981.

1. Defendant states that it was incorrectly named in this action and that its correct legal name is "The MEGA Life & Health Insurance Company." The Clerk is DIRECTED to correct the docket to reflect this change.

tract, authorizing him to sell health and life insurance products for United Group Association, Inc. ("UGA"), a division of MEGA. [Doc. 26–2 ¶ 1; Doc. 26–4 at 14–15; Doc. 26–5 ¶ 4; Doc. 26–6; Doc. 31–14 ¶ 1].[2] The contract, by its terms, applied for the term of one year and automatically expired at the end of that term unless renewed by mutual consent. [Doc. 26–6; Doc. 36–3 ¶ 6]. Darity renewed every year until 2005. [Doc. 26–2 ¶ 4; Doc. 26–5 ¶ 4; Doc. 26–6].

When Darity contracted with UGA in 1996, he signed an addendum to his contract entitled a Lead Request and Waiver Agreement. [Doc. 26–2 ¶ 3; Doc. 26–4 at 14–15; Doc. 26–5 ¶ 5; Doc. 26–6; Doc. 26–7 at Ex. B; Doc. 31–14 ¶ 1]. That document provided:

> By my signature to this LEAD RE-QUEST AND WAIVER AGREEMENT I am requesting [UGA] provide me LEADS[3] at no charge to me.
>
> . . . . .
>
> As ... consideration to induce UGA to provide me LEADS and in recognition of the proprietary nature of LEADS and the competitive advantage LEADS give me I promise, while receiving LEADS from UGA, the following:
>
> i. I will not solicit or attempt to solicit insurance for any company other

than insurance companies (IC) maintaining agreements with UGA.

[Doc. 26–7 at Ex. B (footnote added) ].

Sales agents were classified either as agents or senior agents, depending on experience and volume of sales, and worked under District Sales Leaders who provided them training, mentoring, and guidance. [Doc. 26–2 ¶ 14; Doc. 26–5 ¶ 3]. District Sales Leaders worked under Division Sales Leaders who, in turn, received support from Regional Sales Leaders. [Doc. 26–2 ¶ 14; Doc. 26–5 ¶ 3]. Early on, Darity acted as a senior sales agent but, in 1999, he became a District Sales Leader under the divisional sales leadership of Khalid Waliagha and the regional sales leadership of Perry Quinn. [Doc. 31–6 at 15–16, 18; Doc. 31–9 ¶ 2; Doc. 31–14 ¶¶ 2–3].

Waliagha allegedly made some race-based comments.[4] Because of these comments, Darity sought to distance himself from Waliagha and resumed his role as senior sales agent in 2004 so that he would not have to work directly under Waliagha. [Doc. 26–4 at 76; Doc. 31–6 at 18–19, 21; Doc. 31–9 ¶ 2; Doc. 31–14 ¶¶ 17, 23; Doc. 36–3 ¶ 3]. Darity also spoke to his regional sales leader, Quinn, and, in April 2005, to Ken Schooler, then-Manager of Contracts/Compliance, about Waliagha's conduct. [See Doc. 31–6 at 19, 21, 110–11; Doc. 31–14 ¶ 32; Doc. 36–3 ¶¶ 1, 3].

2. In connection with its motion and in compliance with Local Rule 56.1(B)(1), MEGA has submitted a Statement of Material Facts as to Which There is No Genuine Issue to be Tried, [Doc. 26–2]. Darity, in turn, has filed a Response thereto, [Doc. 31–13], and a Statement of Disputed Material Facts that Create a Genuine Issue for Trial, [Doc. 31–14]. MEGA has not responded to Darity's statement of disputed facts.

3. The term "leads" refers to the names of prospective policyholders used in the solicita-

tion of insurance applications. [Doc. 26–7 at Ex. B].

4. According to Darity, Waliagha made comments to managers not to "hire any more blacks," and pointed at one black agent in a group meeting and said, "Look at this guy. You know, he looks like the golden child, ... if he can do it, any of you guys can." [Doc. 31–6 at 18–19].

In his conversation with Schooler, Darity asked why there had never been any African–American Division Leaders within the hierarchy.[5] [Doc. 36–3 ¶ 4]. Schooler responded that he did not know. [*Id.*]. Darity later posed the same question to Gerald Weir. Weir, a former Division Sales Leader from Chicago, arrived in Georgia on January 11, 2005, to replace Quinn as Regional Sales Leader.[6] [Doc. 26–2 ¶ 13; Doc. 26–8 at 13–14]. Upon his arrival, Darity asked Weir why the company had no African–American Division Leaders, commenting that he hoped he was "not working for a racist company." [Doc. 31–6 at 84; Doc. 31–14 ¶ 30]. Weir responded, "No. No, man. . . . But I think we are [all] a little prejudiced to some extent." [*Doc.* 31–6 at 84].[7] Kevin Fuqua, a former senior agent, declares that, at a company-wide meeting sometime after Weir's arrival, he asked Weir a similar question, i.e., why there were not many black agents working with UGA. [Doc. 35–2 ¶ 5]. According to Fuqua, Weir responded that blacks "just can't do it" in the insurance business.[8] [*Id.*].

Sometime in April 2005, Waliagha was asked to leave because it was discovered that he was bouncing company checks to sales representatives. [Doc. 26–2 ¶ 15;

Doc. 31–7 at 15–16, 20; Doc. 31–14 ¶ 6]. The responsibility of designating a new Division Sales Leader fell to Weir as the Regional Sales Leader. [*See* Doc. 26–5 ¶ 3]. Darity asked Weir to consider him for the position. [Doc. 26–4 at 75, 78; Doc. 31–7 at 26–27; Doc. 31–14 ¶ 6]. Weir had never seen anyone be promoted from a senior sales agent to division sales leader. [Doc. 26–8 at 26–27]. Weir told Darity that senior sales agents could not jump to the division level and that if Darity wanted to become a Division Sales Leader, he would first have to resume his position as District Sales Leader and allow Weir to assess his performance. [Doc. 26–2 ¶ 16; Doc. 26–4 at 79; Doc. 26–8 at 26–27, 79]. Weir informed Darity that if he wanted to become a Division Sales Leader, he would be happy to make him a District Sales Leader right away; however, Darity turned down this offer. [Doc. 26–8 at 26].

Weir interviewed several individuals for the position and chose a Caucasian District Sales Leader from Chicago named Dan Hill. [Doc. 26–2 ¶¶ 18–19; Doc. 26–8 at 21–25; Doc. 31–6 at 25; Doc. 31–14 ¶ 8]. Shortly after Hill became a Division Sales Leader in Atlanta, another Division Sales Leader in Atlanta recommended that Hill review a website of the Georgia Insurance

5. According to the record, the first black Division Sales Leader in the company was promoted in February 2007. [Doc. 31–6 at 80; Doc. 31–14 ¶ 24].

6. Weir considers himself an independent contractor. [Doc. 26–8 at 6]. He interviewed with company heads for the position in Atlanta and was chosen by the company because of his success in Chicago, which the company hoped for him to replicate in Atlanta. [Doc. 31–7 at 11–13, 18, 20; Doc. 31–14 ¶ 5].

7. At one point in his deposition, Darity says that Weir stated, "No. . . . But I think we are a little prejudiced to some extent." [Doc. 26–

4 at 84]. Two other times, however, when Darity mentioned this statement, he referred to the comment as being, "no, but I [think] we're all prejudice[d] to some extent" or "[t]hat we're all prejudiced to some extent." [Doc. 31–6 at 85; Doc. 31–9 ¶ 5]. Moreover, Weir says that he "responded that MEGA was certainly not a 'racist company,' but [told Darity] that [he] believed everyone was prejudiced to some extent." [Doc. 36–2 ¶ 5].

8. Weir denies both that he made this statement and that he believed such a statement to be true. [Doc. 36–2 ¶ 6].

and Safety Fire Commissioner to monitor whether any of his agents who were accepting leads from MEGA were also appointed with competing insurance companies. [Doc. 26–5 ¶ 12]. Hill adopted this recommendation and, per his instruction, Hill's assistant began checking that website once or twice a month to monitor the appointments of Hill's agents. [Doc. 31–14 ¶ 11; Doc. 31–8 at 16].

Using this method, Hill discovered that Darity and four other agents, Mark Hager, Caucasian, Robert Warnock, Caucasian, Ernest Mitchell, African American, and the fiance of Scott Grove, Caucasian, were appointed with other insurance companies. [Doc. 26–2 ¶ 22; Doc. 26–5 ¶ 13]. Hill asked Darity and these other agents to cancel their competing appointments or to provide him with letters allowing MEGA to cancel them on his or her behalf. [Doc. 26–2 ¶ 23. *See also* Doc. 26–5 ¶¶ 13–14; Doc. 36–3 ¶ 5]. All but Darity complied. [Doc. 26–2 ¶ 23; Doc. 26–5 ¶¶ 13–14]. Darity refused to cancel his appointments with other insurance companies on the grounds that he had stopped accepting leads in June or July 2005 and, thus, was under no contractual obligation to do so. [Doc. 31–6 at 41, 52; Doc. 31–14 ¶ 14; Doc. 31–13 ¶ 5; Doc. 26–4 at 33]. Around July 2005, Hill informed Schooler that Darity was in breach of his Lead Request and Waiver Agreement because he was appointed with other insurance companies. [Doc. 36–3 ¶ 5].

Darity received a letter dated December 20, 2005, notifying him that his contract would be terminated within 30 days.[9] [Doc. 31–14 ¶ 16; Doc. 31–9 ¶ 3; Doc. 31–2]. Darity spoke with Schooler about the reasons for the non-renewal, and Schooler

told him that the company would renew his contract if Darity cancelled his other appointments. [Doc. 31–9 ¶ 3; Doc. 31–6 at 51–52]. At Darity's request, his contract was reinstated on January 5, 2006. [Doc. 36–2 ¶ 9; Doc. 36–3 ¶ 7]. On January 6, 2006, Darity informed Weir that he wanted to "go in a different direction" and that he "was not going to stay with MEGA." [Doc. 26–2 ¶ 24; Doc. 26–5 ¶ 16; Doc. 31–9 ¶ 3]. Darity's contract was thus cancelled on or around January 13, 2006. [Doc. 26–2 ¶ 24; Doc. 26–5 ¶ 16; Doc. 26–7 at Ex. F].

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the Court views all evidence in the light most favorable to and makes all reasonable inferences in the favor of the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Knight v. Baptist Hosp. of Miami Inc.,* 330 F.3d 1313, 1316 (11th Cir.2003).

## III. DISCUSSION

### A. Title VII

■ In Count One of the complaint, Darity brings race discrimination and re-

---

9. Darity states in his deposition that Weir and Hill informed him that they did not cancel his

contract, that the "company" did. [Doc. 31–6 at 50–51].

taliation claims under Title VII. MEGA argues that Darity's Title VII claims fail because he was an independent contractor and thus not protected under Title VII. *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir.1982). Darity does not contest this argument but contends that, even if he was an independent contractor, he can proceed with his claims under § 1981. Because Darity has apparently abandoned his Title VII claims, the Court will address his allegations under § 1981 only.[10]

### B. Section 1981

#### 1. Race Discrimination Claims

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b). Darity complains that MEGA violated this provision by denying him consideration for the position of Division Sales Leader and by not renewing his contract.[11] The Court addresses each action in turn.

#### a. The Division Sales Leader Position

Darity alleges that Weir did not consider him for the position of Division Sales Leader because of his race. MEGA asserts that it cannot be held liable for Weir's actions because Weir, the only decision-maker with regard to this action, worked as an independent contractor.

MEGA cites *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1245 (11th Cir. 1998), in support of its position. In *Llampallas*, the plaintiff was terminated by a member of a non-profit association of condominium owners. 163 F.3d at 1245 n. 15. The court held that the association, who was sued, could not be held liable for the member's decision because it had nothing to do with the decision. *Id.* at 1245. In the court's words, the association "made no decisions that affected the terms and conditions of employment" with the member and "was completely uninvolved in the operation of [the member]." [*Id.*].

Here, however, the record creates an inference that MEGA was more involved. First, Darity's contract was with a division of MEGA. The company designated Weir to act as Regional Sales Leader over Darity and others in Weir's region. In his capacity as Regional Sales Leader, Weir was given the authority to select Division Sales Leaders. [Doc. 26–5 ¶ 3; Doc. 31–14 ¶ 5; Doc. 31–7 at 11–13, 18, 20]. Although MEGA asserts that it had nothing to do with this decision, and that Weir was an independent contractor, based on this evidence, a jury could find that Weir was acting as an agent of MEGA in making his selection. *Cf. Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 295 (11th Cir.1988) (rejecting as frivolous the contention that two physicians were not agents of a hospital where one was a department chairman and the other was the director of the hospital's training program). If the jury concludes that Weir was acting as an agent of MEGA in selecting a Division Sales Lead-

---

**10.** As a practical matter, this makes no substantive difference to the Court's ruling on the motion for summary judgment since the analysis is the same under Title VII and § 1981. *See Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1330 (11th Cir.1998).

**11.** In his response brief, Darity restricts the scope of this action to these claims. [Doc. 31–12 at 1].

er, MEGA can be held liable for Weir's decision. Accordingly, the Court rejects MEGA's first argument and proceeds to the merits of Darity's claim.

 A plaintiff claiming race discrimination can prove his case through direct or circumstantial evidence. *Kincaid v. Bd. of Trustees,* 188 Fed.Appx. 810, 815 (11th Cir.2006) (unpublished). Absent direct evidence of discrimination, the Court applies the familiar burden-shifting *McDonnell Douglas* framework to plaintiff's claim. *Jackson v. Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005). The *McDonnell Douglas* test, however, is inapplicable where a plaintiff presents direct evidence that he was discriminated against on the basis of an unlawful trait. *Mullins v. Crowell,* 228 F.3d 1305, 1312 n. 14 (11th Cir.2000). Direct evidence, if believed, proves discrimination without inference or presumption. *Holifield v. Re* no, 115 F.3d 1555, 1561 (11th Cir.1997) (quoting *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989)).

 In this case, Darity argues that Weir's alleged statements that blacks "just can't do it" in the insurance industry and that "we're all prejudiced to some extent" constitute direct evidence that Weir did not consider him for the Division Sales Leader position on the basis of his race. The undersigned disagrees. The Eleventh Circuit has held that direct evidence must reflect a discriminatory attitude which correlates to the actual discrimination complained of by the plaintiff. *Akouri v. State of Fla. Dep't of Transp.,* 408 F.3d 1338, 1347 (11th Cir.2005) (*quoting Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999)). That is, to constitute direct evidence, "the remark must indicate that the employment deci-

sion in question was motivated by race." *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1227–28 (11th Cir.2002). Here, neither of Weir's remarks specifically addressed the decision not to consider Darity for the position of Division Sales Leader. The comments were allegedly made months before the position came open, outside the context of the selection process. *Tran v. Boeing Co.,* 190 Fed.Appx. 929, 932 (11th Cir.2006) (unpublished). "[R]emarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard,* 161 F.3d at 1330. Given that there is no direct link between Weir's alleged remarks and the decision in question in this claim, the undersigned concludes that they do not constitute direct evidence.

 Although Weir's comments do not constitute direct evidence that he discriminated against Darity on the basis of race in the Division Sales Leader position selection process, the comments can be considered circumstantial evidence in the *McDonnell Douglas* analysis. *Jackson,* 405 F.3d at 1289. Under the *McDonnell Douglas* framework, the plaintiff must first present a *prima facie* case of discrimination. *Burke–Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1323 (11th Cir.2006). If the plaintiff successfully satisfies his *prima facie* burden, then the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir.2004). If the defendant, in turn, meets this burden, thus rebutting the presumption of discrimination, the burden of production shifts back to the plaintiff to offer evidence that defendant's proffered reason is a pretext for unlawful discrimination. *Id.; Combs v. Plantation Patterns,* 106 F.3d 1519, 1528

(11th Cir.1997); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*quoting Tex. Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Applying the *McDonnell Douglas* test, the undersigned assumes, for purposes of this motion, that Darity can satisfy a *prima facie* case with respect to the selection of a Division Sales Leader.[12] MEGA asserts that Weir did not consider Darity for the position vacated by Waliagha because Darity was not a District Sales Leader at the time of the decision. Because this explanation constitutes a legitimate, nondiscriminatory explanation of the decision, the onus is on Darity to demonstrate that race was the real reason he was not considered and selected.

■ To demonstrate pretext, the plaintiff's evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the defendant's explanations such "that a reasonable factfinder could find them unworthy of credence." *Cooper v. S. Co.,* 390 F.3d 695, 725 (11th Cir.2004). The plaintiff may prove pretext by "either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." *Wilson,* 376 F.3d at 1088. Thus, a plaintiff may create an issue of fact at the pretext stage by (1) presenting evidence that the defendant's proffered reason is not worthy of belief, thereby enabling the jury to infer that discrimination was the employer's real reason, or (2) presenting evidence that discrimination was, in fact, the employer's real reason. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742. Ultimately, the plaintiff must show that the employer discriminated against him because of his race. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

■ Darity has produced insufficient evidence to allow a jury to decide in this case that race was the real reason that Weir did not consider or select him for the open Division Sales Leader position. Notably, Darity has failed to produce the name of a single senior sales agent of any race, similarly situated to him, who was named to a Division Sales Leader position. Under these circumstances, summary judgment is appropriate unless other evidence of discrimination is present. *Holifield,* 115 F.3d at 1562.

Darity makes a number of arguments purporting to demonstrate pretext, none of which are successful. First, Darity insinuates that Weir's requirement that Waliagha's replacement be chosen from the pool of current District Sales Leaders somehow limited the field to white applicants. [Doc. 31–12]. The record, however, does not support such a view. As demonstrated by the record, there were both white and black District Sales Leaders at the time of Weir's decision. [*See* Doc. 31–6 at 19, 21,

---

12. As part of his *prima facie* burden on this claim, Darity would have to show that he was qualified for the position. *See Wilson,* 376 F.3d at 1087. MEGA argues that, because Darity was not a District Sales Leader at the time of his request for consideration, he was not qualified to fill the Division Sales Leader vacancy. Because this issue is inextricably intertwined with the question of pretext, the undersigned assumes that Darity can meet a *prima facie* burden. *See Holifield,* 115 F.3d at 1562 n. 3.

25, 85; Doc. 31–7 at 21, 25; Doc. 31–14 ¶ 9].

Second, Darity contends that Weir should have considered his former performance as a District Sales Leader rather than excluding him on the basis that he was not serving in that capacity at the time of the decision. Darity's argument, however, attacks the wisdom of Weir's decision, which is outside the province of this Court. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (the Court's "inquiry is limited to whether the employer gave an honest explanation of its behavior"). As he communicated to Darity, Weir wanted the opportunity to observe Darity personally in a District Sales Leader position. [Doc. 31–6 at 79]. This is a legitimate, non-discriminatory explanation for requiring Darity to be a District Sales Leader under his watch. Although Darity believes that Weir, instead, should have accessed and relied on reports of his past performance as a District Sales Leader, he offers no evidence that Weir's failure to do so was motivated by race.

Third, Darity challenges the manner in which Weir identified interested candidates in the selection process and complains that Weir selected Hill because they were friends and socialized together. Neither of these proves pretext as to Weir's reasons for not considering Darity for the position. When an employer uses informal, word-of-mouth processes to identify candidates for consideration, the plaintiff must show that the employer "had some reason to consider him for the post." *Vessels v. Atlanta Independent Sch. Sys.*, 408 F.3d 763, 768 (11th Cir.2005). Here, it is clear that Darity was aware of the open position and, in fact, expressed his interest in the position to Weir. As discussed, Weir explained why he did not consider Darity for the position, and Darity must rebut this reason to carry his burden of proving pretext. Likewise, Darity's claim that Weir selected Hill because they "were buddies" and played golf and went SCUBA diving together does not prove pretext because friendship and cronyism are not prohibited considerations for employment actions.[13] *Parks v. Rumsfeld*, 119 Fed.Appx. 382, 385 (3d Cir.2005) (unpublished) (*citing Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir.1990)); *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir.2003).

Finally, Darity asserts that there is evidence of pervasive bias on the part of Weir and management toward African–Americans. Specifically, Darity points to evidence demonstrating an absence of African–American Division Sales Leaders, Waliagha's discriminatory comments, and Weir's own comments. Evidence that no African–Americans had been promoted to the position of Division Sales Leader does not, without more, prove pretext as to Weir's decision. Given enough context, the absence of African–Americans from these positions might be relevant. *See generally Thornton v. Mercantile Stores Co., Inc.*, 180 F.R.D. 437, 441–42 (M.D.Ala. 1998) (noting significance of statistical evidence in disparate treatment claims). Context, however, is critical. *See Hughes v. Ala. Dep't of Pub. Safety*, 994 F.Supp. 1395, 1403 (M.D.Ala.1998). "In a disparate treatment case, the statistical evidence must be 'finely tuned' to compare the employer's relevant workforce with

---

13. The undersigned notes that Hill, unlike Darity, was a District Sales Leader at the time of his selection. [Doc. 26–5 ¶ 2]. This fact supports Weir's explanation of his non-consideration of Darity.

the qualified populations in the relevant labor market." *Forehand v. Fla. State Hosp.*, 89 F.3d 1562, 1575 (11th Cir.1996) (*quoting E.E.O.C. v. Olson's Dairy Queens, Inc.*, 989 F.2d 165, 168 (5th Cir. 1993)).

Darity contends that in circumstances where there exists "the inexorable zero," the complete absence of any member of a protected class in a position, as here, statistical analysis is unnecessary. "Under the 'inexorable zero' test, ... when an employer with a statistically large enough workforce employs no African Americans, [courts] can infer that the employer intentionally discriminates against African Americans in its hiring decisions." *Woodson v. Pfizer, Inc.*, 34 Fed.Appx. 490, 492–93 (7th Cir.2002) (unpublished). *See also Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Some context, however, is still required. At the very least, because this is a case of alleged discrimination of an individual, Darity must still establish the size of the sample, i.e., the number of Division Sales Leaders in the company up to 2007, and the statistical meaning of the inexorable zero. *See Woodson*, 34 Fed.Appx. at 493 (explaining that small number of employees made the "inexorable zero" insignificant); *Clark v. ALFA Ins. Co.*, No. Civ.A. 00–AR–3296–S, 2002 WL 32366291, *3 (N.D.Ala. May 28, 2002) (rejecting plaintiff's argument that she was "relieved from producing meaningful statistical analysis by an 'inexorable zero' exception to the usual requirement of statistical analysis" because case was not a pattern and practice action). Darity points to no evidence which establishes the size of the sample nor any evidence, expert or otherwise, which demonstrates the statistical significance of the absence of African-American Division Sales Leaders. In short, Darity's reliance on the absence of African–American Division Sales Leaders is not sufficiently probative to create a genuine issue of pretext.

■ The comments made by Waliagha and Weir likewise are insufficient to prove pretext. The record demonstrates that Weir made the decision not to consider Darity for the Division Sales Leader position. Waliagha's alleged discriminatory comments are not probative of prextext since he was not the decision-maker on the challenged action and was not even working for MEGA at the time of Darity's non-selection. Weir's alleged comments, as already explained, were also made prior to and outside of the context of the selection itself. *Scott*, 295 F.3d at 1229–30 (alleged discriminatory remark did not create genuine issue of material fact on issue of pretext where the remark was not related to termination and there was no additional persuasive evidence of pretext). Stray discriminatory comments made outside the decision-making process "are typically insufficient alone to prove pretext." *Smith v. Wynfield Dev. Co., Inc.*, 451 F.Supp.2d 1327, 1347 (N.D.Ga.2006). *See also Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir.2003) (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring), *overruled by statute on other grounds*) (" 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process' at issue will not satisfy the employee's burden."). Here, Darity has not presented any other persuasive evidence of pretext, and because he has failed to establish any genuine issue of material fact that the reason given for his non-selection is pretextual, the undersigned **RECOMMENDS** that summary judgment be granted in favor of MEGA on this claim.

### b. Non-renewal of Contract

■ Darity alleges that MEGA failed to renew his contract at the end of 2005 because of his race. Because Darity proffers no direct evidence with regard to this claim, the Court applies the *McDonnell Douglas* test in assessing its merits. *Jackson,* 405 F.3d at 1289. Assuming, again, for purposes of this motion that Darity can satisfy his *prima facie* burden, MEGA successfully articulates a legitimate, non-discriminatory reason for not renewing Darity's contract at the end of 2005. In its initial brief, MEGA asserts that Hill required all agents in his division to cancel or request cancellation of their appointments with competing insurance companies and that Darity's persistent refusal to comply with Hill's demand constituted a violation of his contract and resulted in its non-renewal.[14] [Doc. 26–3 at 20–21]. According to MEGA, Darity's claim fails because he has not pointed to any agent who similarly refused to provide Hill with letters of cancellation and yet was allowed to contract with MEGA.

■ In an attempt to prove pretext, Darity attacks MEGA's reading of the contract, arguing that, contrary to MEGA's assertions, he was not in violation of his contract and should not have been required to cancel his appointments with other insurance companies because he had stopped accepting leads mid–2005. Darity's argument is supported by the language of the Lead Request and Waiver Agreement. Under that document, Darity promised not to solicit or attempt to solicit insurance for any company other than insurance companies maintaining agreements with UGA "while receiving LEADS from UGA." [Doc. 26–7 at Ex. B]. As Hill states, if an agent accepted leads from MEGA and was also appointed with a competing insurance company, this violated the Lead Request and Waiver Agreement. [Doc. 36–6 ¶ 2]. Nothing in the Lead Request and Waiver Agreement, however, suggests that if an agent had stopped accepting leads, he was similarly restricted. In fact, Amy Tabor, an individual in the contracting department, informed Darity that he was free to contract with other insurance companies so long as he did not receive leads. [Doc. 31–14 ¶ 15; Doc. 31–6 at 52, 173].

■ Darity testified that he stopped receiving leads from MEGA in June or July 2005, and his testimony is unrebutted. [Doc. 31–6 at 41, 52; Doc. 31–14 ¶ 14; Doc. 31–13 ¶ 5; Doc. 26–4 at

---

14. In its reply, MEGA asserts that Darity's contract was not renewed at the end of 2005 because he "was in breach of his agent contract, had stopped writing business for the company, and had stopped attending agent meetings." [Doc. 36 at 9]. This explanation more adequately re-states Hill, Weir, and Schooler's testimony on the subject. [*See* Doc. 36–2 ¶ 9; Doc. 36–3 ¶ 6]. According to Hill, Weir, and Schooler, Darity's sales production numbers began to decline starting in July 2005, and, in the latter half of the year, Darity stopped turning in new business through the Hill division and stopped attending sales meetings. [Doc. 36–2 ¶ 9; Doc. 36–3 ¶ 5; Doc. 36–6 ¶]. Weir testified that, "[f]or these reasons, Mr. Hill and I assumed Plain-

tiff was not renewing his agent contract with MEGA." [Doc. 36–2 ¶ 9]. Schooler testified that "[b]ecause Mr. Darity continued to refuse to cancel his competing appointments, had stopped selling MEGA business, and stopped attending sales meetings, MEGA assumed he no longer wished to work with MEGA, and his contract expired according to its terms on December 15, 2005." [Doc. 36–3 ¶ 6]. However, so as not to prejudice Darity who, perhaps in view of MEGA's initial brief, addressed only appointment with other insurance companies, the undersigned discusses the non-renewal in terms of Darity's appointments.

33]. Accordingly, from a contractual standpoint, he was free to seek appointments with other insurance companies in the latter half of 2005. This fact, by itself, however, does not satisfy Darity's burden at the pretext stage. The relevant inquiry in a race discrimination case is whether there is evidence that the plaintiff was treated in a certain way because of his race. *See Elrod*, 939 F.2d at 1470; *Maull v. Div. of State Police, Dep't of Pub. Safety, State of Del.*, 141 F.Supp.2d 463, 483–84 (D.Del.2001) (noting that evidence that the defendant's proffered reasons were pretextual only defeat summary judgment if the evidence could persuade a reasonable factfinder that the action was taken because of intentional race discrimination). Proof that Darity did not technically violate his contract by refusing to cancel his appointments with other insurance companies, then, is not enough. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) (employee who showed that he was fired for violating a rule he did not violate still failed to prove intentional discrimination). An employer can take action against an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.* Thus, Darity must produce some evidence that allows an inference of race discrimination, e.g., evidence that similarly situated comparators outside of his own class were treated differently. *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir.2001) (citation omitted); *Cooper*, 390 F.3d at 729. "If a plaintiff fails to show the existence of a similarly situated employees, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (emphasis omitted).

In response to summary judgment, Darity produces a list of 69 agents whose names appeared on the Georgia Insurance and Fire Safety Commission's website as having appointments with both MEGA and other insurance companies on April 15, 2007. [Docs. 31–3, 31–4, 31–5]. Darity makes specific note of six Caucasian agents: Emory Allen, David Ashbury, Joel Etheridge, Robert Newman, Mark Hager, and Percy Brooks. Darity bears the burden of proving that he and these comparators are "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562. *See also Roland v. United States Postal Serv.*, 200 Fed.Appx. 868, 872 (11th Cir. 2006) (unpublished) (*quoting Wilson*, 376 F.3d at 1091).

■ MEGA asserts that the first four agents, Allen, Ashbury, Etheridge, and Newman, are poor comparators because they do not work in Hill's division. "[A]lthough not always dispositive, failure to show a common supervisor can be a strong factor against a finding that employees are similarly situated." *Jones v. Ala. Power Co.*, No. 2:06cv780–ID, 2007 WL 3496720, *6 (M.D.Ala. Nov.14, 2007). As MEGA notes, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir.2001).

Here, the fact that Allen, Ashbury, Etheridge, and Newman did not work under Hill does, in fact, make them poor comparators to Darity. The record demonstrates that Hill decided to monitor the contracting status of the agents in his division and that, upon discovery that Darity and the others were appointed with other insurance companies, reported them to Schooler. [Doc. 26–5 ¶¶ 1, 13; Doc. 36–6 ¶ 1]. Relevant comparators in this case, then, are agents within Hill's division. *See*

*Mack v. St Mobile Aerospace Eng'g, Inc.,* 195 Fed. Appx. 829, 845 (11th Cir.2006) (unpublished) (finding comparators not similarly situated because they worked under the supervision of different program managers); *Maull,* 141 F.Supp.2d at 483 (disregarding evidence of comparators who were disciplined by different decisionmakers because such evidence is "seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently") (citation omitted). Because Allen, Ashbury, Etheridge, and Newman did not work under Hill, the fact that their names appear on the Georgia Insurance and Fire Safety Commission's website does not raise an inference that Darity's contract was not renewed because of race.

As for Hager, Hill testified in his initial affidavit that he learned that Hager was selling insurance products for competitor insurance companies but that Hager agreed to provide him with a document cancelling his competing appointments. [Doc. 26–5 ¶ 13 (*citing* Doc. 26–7 at Ex. E) ]. Hill testified in a later affidavit that Hager routinely provided MEGA with letters of cancellation and that Hill personally submitted Hager's letters on at least three occasions. [Doc. 36–6 ¶ 4; Doc. 36–7, Ex. 4]. Hill explained that, for some reason, Hager's contracts appear to have been periodically renewed after cancellation but that Hager was not, at the time of his testimony, selling competing products.

[Doc. 36–6 ¶ 4]. Although Darity attempts to create an inference that Hager was, in fact, selling competing products,[15] the fact remains that Hager is not similarly situated to Darity, who refused to provide Hill with any letter of cancellation.

Finally, the evidence does not show that Brooks was treated differently than Darity. Hill testified that Brooks works in Alabama, not Georgia, like Darity. [Doc. 36–6 ¶ 4]. Hill testified that he first learned that Brooks was contracted with another company at his deposition and that, upon discovery of this fact, he questioned Brooks. [*Id.*]. Hill testified that he learned that Brooks was selling Medicare supplemental products, which MEGA does not sell. [*Id.*]. Nonetheless, he still asked Brooks to drop his other appointments if he wished to continue receiving leads from MEGA. [*Id.*]. Thus, Brooks was not treated differently than Darity. Unlike Darity, Brooks simply complied with Hill's request. [*Id.* ¶ 4 & Ex. 2].

In sum, the comparators on whom Darity relies fail to create an inference that his own treatment was based on race. Because Darity has produced no evidence that race played a part in the non-renewal of his contract, this claim also fails. Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** in favor of MEGA on this claim.

### 2. Retaliation Claims

 Darity brings retaliation claims under § 1981, alleging that he was denied

15. Darity points out that, as of the date of his brief, Hager was still listed on the Georgia Insurance and Safety Fire Commissioner's site as having appointments with American General Life Insurance Company, among others. [Doc. 31–12 at 17]. Likewise, Darity states that Fuqua, too, was appointed with American General Life Insurance Company but that, when he failed to sell any products

for them, American General Life Insurance Company cancelled his appointment. [Doc. 31–12 at 17–18 (*citing* Doc. 35–2 ¶ 7)]. In essence, Darity argues that, had Hager really stopped selling products through American General Life Insurance Company, American General Life Insurance Company would have cancelled his appointment, like they did with Fuqua.

an interview for the Division Sales Leader position and his contract was not renewed because he complained about discrimination. Although the Eleventh Circuit has not defined the elements of a § 1981 retaliation claim, *see Everson v. Coca–Cola Co.*, No. 06–15752, 2007 WL 2088839, *1 (11th Cir. July 23, 2007) (*citing Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1120 n. 10 (11th Cir.2001)), both parties utilize the Title VII framework in analyzing this claim, and, therefore, the Court does the same. Under this framework, in order to succeed at the *prima facie* stage on a retaliation claim, Darity must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Id.* (*citing Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir.2006)). MEGA argues that Darity's claims fail on the first and the third elements.

■ In the Title VII context, in order to show that the employee engaged in protected activity, he must show that he "either voiced some *opposition* to race discrimination or *participated* in some proceeding concerning an allegation of race discrimination." *Holiness v. Moore–Handley, Inc.*, 114 F.Supp.2d 1176, 1186 (N.D.Ala.1999). For purposes of this motion, the Court concludes that the same showing is required under § 1981.

■ In proving causal connection, a plaintiff must show that "the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001) (internal marks

and citation omitted); *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998) (same); *Holifield*, 115 F.3d at 1566 (quoting *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993)) (emphasis omitted). At a minimum, the plaintiff must demonstrate that the decision-maker was aware of the protected conduct. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir.2000). In addition, he must show that the protected activity and the adverse act were at least somewhat related or in close temporal proximity. *Id.* See also *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Bass*, 256 F.3d at 1119; *Pennington*, 261 F.3d at 1266 (articulating burden as requiring proof that the two are "not completely unrelated") (internal quotation omitted); *Wideman*, 141 F.3d at 1457.

■ Darity fails to meet his burden of proof as to causation. As proof that he engaged in protected activity, Darity relies on the communications he had with Quinn, Schooler, and Weir about Waliagha and the lack of African–American Division Sales Leaders.[16] [*See* Doc. 31–12 at 21. But see Doc. 31–14 ¶ 29]. There is insufficient proof, however, that these conversations can be causally linked to the decisions not to promote Darity and to cancel his contract.

■ With regard to the decision not to interview or select Darity for the position of Division Sales Leader, Weir was the sole decision-maker. Darity has offered no proof that Weir knew that he had ever complained to Quinn or Schooler about Wagliagha or questioned the racial makeup of the company. "Where there is no

---

**16.** Because Darity fails to prove that these communications had a causal connection to his denied interview or cancelled contract, the Court need not decide whether these communications constitute protected activity, an issue which is disputed in this case.

evidence to support a connection between the individual who decides on discipline and the individual who engaged in alleged harassment, there is no actionable claim to redress the discipline." *Williams v. Verizon Washington, DC, Inc.*, 266 F.Supp.2d 107, 122 (D.D.C.2003). Accordingly, Darity fails to prove any causal connection between his communications with Quinn and Schooler and Weir's decision not to interview Darity.

■ As for a causal connection between his conversation with Weir and Weir's decision, Darity relies solely on the temporal proximity between the events. " '[C]lose temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon*, 393 F.3d at 1220. However, "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Hig-*

*don*, 393 F.3d at 1220 (holding that, by itself, a gap of three months was too long to support an inference of retaliation). *See also Breeden*, 532 U.S. at 273, 121 S.Ct. 1508 (citing with approval circuit court cases invalidating temporal proximities of three and four months) (internal quotation marks omitted).

Darity asserts that Weir refused to promote him within three months of his conversation about the lack of African–American Division Sales Leaders in the company.[17] By itself, a three-month gap does not allow a reasonable inference of a causal relation between the protected expression and the adverse action. *Higdon*, 393 F.3d at 1221. Because Darity presents no other evidence of causation, he fails to establish that his conversation with Weir and Weir's decision are causally connected. Accordingly, any retaliation claim based on Weir's decision not to promote Darity to the position of Division Sales Leader fails.

With regard to the non-renewal of Darity's contract, even if the record does not clearly establish who made the final decision not to renew his contract, the record allows an inference that Schooler and Hill were involved in that decision insomuch as Hill informed Schooler that Darity refused to cancel his other appointments and thereafter Darity's contract was not renewed.[18] [Doc. 31–6 at 50–51, 110]. Darity points to no evidence that Hill was

---

17. Darity presents no evidence which establishes the exact dates on which he commented about the lack of African–American Division Sales Leaders to Weir and on which he asked Weir to consider him for the position of Division Sales Leader. The evidence shows only that Darity had the first conversation with Weir "right after" he arrived in Atlanta on January 11, 2005, [Doc. 26–2 ¶ 13; Doc. 26–8 at 13–14; Doc. 31–14; Doc. 31–6 at 84; Doc. 31–9 ¶ 5], and that he approached Weir about

the Division Sales Leader vacancy "when [it] came open in April 2005" and was turned down at that time. [Doc. 26–2 ¶ 15; Doc. 31–14 ¶ 6; Doc. 31–7 at 15–16, 20; Doc. 31–9 ¶ 16].

18. There is no evidence that Weir or Quinn participated in that decision; in fact, according to Darity's testimony, Quinn had already left the company. [Doc. 31–6 at 21, 50–51].

aware of any of the allegedly protected conversations with Schooler, Quinn, or Weir. Similarly, there is no evidence that Schooler was aware of the conversations with Quinn or Weir. Accordingly, in order to proceed on any retaliation claim based on the non-renewal of his contract, Darity must prove a causal connection between the conversation he had with Schooler and the non-renewal of his contract.

Darity points to no specific evidence connecting these events. Accordingly, the Court considers the timing between the two. Darity spoke with Schooler about racial disparity and Waliagha's comments in April 2005. Darity has presented no evidence to establish when the actual decision not to renew his contract, if any, was made. The non-renewal letter, however, was dated December 20, 2005. [Doc. 31–14 ¶ 16; Doc. 31–9 ¶ 3; Doc. 31–2]. Such a lapse in time does not support an inference of causal connection. *Higdon*, 393 F.3d at 1221. Accordingly, summary judgment is appropriate on this claim as well.

## IV. *CONCLUSION*

For all the foregoing reasons, the undersigned **RECOMMENDS** that MEGA's Motion for Summary Judgment, [Doc. 26], be **GRANTED**. The Clerk is **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED.**