[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11328

Non-Argument Calendar

_____

MARIUS BROWN,

Plaintiff-Appellant,

*versus*

WRIGLEY MANUFACTURING COMPANY, LLC,
MATT ARENDS,
in their individual capacities,
FRANK SLOTTERBACK,
in their individual capacities,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:18-cv-00141-RWS

————————————

Before JORDAN, ROSENBAUM, Circuit Judges, and SCHLESINGER,[*]
District Judge.

PER CURIAM:

Plaintiff-Appellant Marius Brown appeals the district court's order granting Defendants-Appellees Wrigley Manufacturing Company, LLC's (as well as two of its employees') motion for summary judgment in Brown's civil-rights suit alleging racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* First, Brown argues that the district court erred in granting the defendants' motion as to his discrimination claims because he established that the defendants' proffered reasons for failing to promote him on five occasions were pretext for discrimination and because, alternatively, he presented a "convincing mosaic" of the defendants' discriminatory intent. Second, Brown asserts that the district court erred in granting the defendants' motion as to his retaliation claims because he established a causal link between his protected activities and the defendants' adverse actions, and he

_____

[*] The Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation

showed that the defendants' proffered reasons for their adverse actions were pretextual.

After careful consideration and with the benefit of oral argument, we vacate the judgment as it relates to the discrimination claims, and we affirm it as it concerns the retaliation claims.

## I.

Marius Brown is a 40-year-old Black male.  He earned a Bachelor's degree in Business Administration, Business Information Systems, from the University of West Georgia.  Brown began working for Wrigley in 2006.

Wrigley is a gum-manufacturing company with 16,000 employees worldwide.  It operates a manufacturing plant in Flowery Branch, Georgia, at which Brown worked.

Brown began his tenure with Wrigley as a Machine Operator in the Processing Department.  He stayed in that role for one year.  At that time, Wrigley eliminated his position because the Plant transitioned from two twelve-hour shifts to three eight-hour shifts.

Brown then applied for and was offered an Operator position in the Sheeting Department, where he worked for about eight years.  In September 2015, Brown became Shift Lead on the afternoon shift in the newly created Tab Department ("Tab").[1]  Frank

---

[1] Tab dealt with Wrigley products that were in the form of tabs, or smaller slabs, than sticks of chewing gum.

Slotterback (a white man) was Brown's Line Lead and supervisor from June 2015 to January 2019.

Matt Arends was the Plant Director at the Flowery Branch plant.  As Director, Arends was responsible for, among other things, employment actions at the Plant.

In July 2016, Slotterback met with Brown to discuss a conflict between an Operator and a Mechanic who worked on the afternoon shift under Brown, and Slotterback told Brown that Brown had mismanaged the conflict.  The Operator later expressed that he felt threatened by the Mechanic, and Brown had not done anything to resolve the conflict.

In October 2016, Slotterback again met with Brown to discuss his ability to manage conflict.  Slotterback initiated this meeting because two of Brown's associates were abusing the call-out procedures and, in Slotterback's view, although these associates improperly asked for time off, Brown granted their vacation requests.  On January 19, 2017, Slotterback added comments to Brown's 2016 Performance and Development Review ("Review")—an assessment of how associates performed against the goals and objectives they agreed to at the beginning of the year, which culminates in a performance rating that impacts their merit pay increases.  Slotterback's comments stated that he had concerns with Brown's conflict-management and decision-making skills. But over the ensuing months, Slotterback's views of Brown's management skills improved.  In October 2018, during a restructuring

of the plant, Slotterback gave Brown a high rating for "conflict management."

Brown was otherwise successful as the Shift Lead in Tab. He was responsible for, among other things, overseeing and training associates, coverage (finding associates to cover shifts when others were absent), general efficiency, quality and safety, as well as operating machines when his shift was short-staffed. Additionally, Brown served as a Safety Champion and assisted with validating and qualifying new Tab machines and equipment. Besides these tasks, Brown spent several months in Tab supervising an additional line after that line's Shift Lead took a new position. Brown was also selected to be on a total-production management team, which was a team created to find ways to save the company costs.

In May 2016, to further develop his leadership and conflict-management skills, Brown completed a "Crucial Accountability Course" to learn best practices for successfully creating accountability. This course taught about tools and plans for effectively resolving broken promises, violated expectations, and other conflicts. Brown received an annual performance rating of "meets expectations" for the seven years before 2020. And he consistently received merit pay increases during his time at Wrigley.

Still, Brown never advanced any further than Shift Lead at Wrigley. And after the restructuring of the plant, Brown was demoted to Senior Sheeting Operator in the Processing Department. Brown's stagnation as a Shift Lead wasn't because he didn't apply to other positions. In fact, during the 12-month period from

February 2017 to January 2018, Brown applied for five different promotions within Wrigley and was denied all of them. The successful candidate for each promotion was white. Not only that, but in three of the five cases, Wrigley installed a white interim manager for the position and then selected that same person. Below, we recount the details surrounding these applications.

In February 2017, Brown applied for Shift Lead on the day shift in the Packaging Department. Brown was already a Shift Lead, but the new job would have been on the day shift, so it was viewed as a promotion. Slotterback, in addition to being Brown's Line Lead for the role he was already in, was the hiring manager for this promotion position.

Generally, Wrigley had a policy that an employee would not receive an interview for a promotion if his current supervisor did not support his application. Initially, Slotterback informed Brown that he did not support Brown's application for the day-shift Shift Lead position and would not interview him. Ultimately, though, and despite his January 2017 negative comments about Brown's conflict-management skills, Slotterback supported Brown's application and interviewed him. But Brown didn't get the job. Rather, Wrigley awarded the position to a white mechanic without Tab experience or a four-year college degree. According to Wrigley's evidence, the selected candidate's interview responses for this position were rated 4 out of 5 by the hiring panel, while Brown's were rated 3 out of 5. Brown was required to train the successful candidate in this Shift Lead role after he was hired.

Next, in March 2017, Brown applied for a Shift Lead position on the day shift in the Processing Department. The hiring manager for this position was Courtney McWaine, who was Black. And the job description stated that a two-year associate's technical degree was a preferred qualification for the position. But Slotterback did not support Brown's application for this role, so Brown did not receive an interview. Instead, a high-school educated white man was selected.

Brown was next denied two promotions in October 2017, a Line Lead job in the Packaging Department and a Line Lead job in the Processing Department. Slotterback supported Brown's applications for both roles, so Brown was interviewed for both. Nevertheless, Brown was passed over for both jobs, and both were filled by white candidates, including one without a college degree. When Brown met a supervisor afterward to obtain feedback, the supervisor suggested Brown obtain a Master's Degree, even though it was not a requirement of the position and Wrigley had just selected a candidate without even a college degree over Brown.

The hiring managers for each role provided declarations that Brown's interview performance was inferior to the candidate selected. For example, they said, he struggled to clearly identify issues he was attempting to resolve, how he would support an associate through a given situation, or explain how the resolution benefited a fellow associate or the organization. As for the Processing Department job, Wrigley presented evidence that, after their

interviews, the selected candidate was rated 4.11 out of 5 while Brown was rated 2.83.

Last, Brown applied for the job of Process Lead in the Processing Department in January 2018. Slotterback supported Brown's application for this position, and Brown was selected for an interview, but Wrigley offered the job to a white man instead.

The last three jobs—the two in October 2017 and one in January 2018—were ultimately filled by the candidate whom Wrigley had previously and unilaterally asked to fill the vacant role on an interim basis. Sometimes Wrigley would allow an employee to act in an interim role for an open position to give the employee an opportunity to experience that position. But interim positions were not posted or advertised. So Brown never received an opportunity to act in such a role. At the district court, Brown argued that Wrigley used the interim process to ensure that less-qualified, non-Black candidates had experience in the role and would therefore be the most natural ones to promote.

Throughout the period that Brown was being denied promotions, Brown filed various internal complaints expressing his dissatisfaction with being passed over for the jobs. Eventually, he filed an EEOC charge against Wrigley.

In August 2018, Brown filed his original complaint in district court. He alleged race-discrimination and retaliation claims under 42 U.S.C. § 1981 and Title VII, as well as state-law claims of negligent retention and supervision and intentional infliction of

emotional distress. The district court entered an order dismissing Brown's state-law claims, his Title VII failure-to-promote claims based on conduct before August 24, 2017, and his § 1981 failure-to-promote claims based on conduct before August 24, 2016. Brown does not appeal those dismissals.

Wrigley and the individual defendants then moved for summary judgment on the remaining claims. The district court adopted the magistrate judge's recommendation that the defendants be granted summary judgment. Brown appeals.

## II.

We review de novo a district court's order granting summary judgment, "viewing all evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if it can show "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing the summary-judgment record, a district court must view the evidence in the light most favorable to the non-moving party. *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1207 (11th Cir. 2018). We have held that "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Likewise, "[i]nferences based on speculation and a mere

scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quotation marks omitted).

## III.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Similarly, 42 U.S.C. § 1981(a) prohibits intentional race discrimination in the making and enforcement of public and private contracts. With respect to employment contracts, we analyze § 1981 claims of discrimination under the same framework as claims of discrimination under Title VII. *Ferrill v. Parker Grp.*, 168 F.3d 468, 472 (11th Cir. 1999).

In the absence of direct evidence of discrimination, a plaintiff can prove a discrimination claim under Title VII through circumstantial evidence, which we generally analyze using the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* A plaintiff who does that raises a rebuttable presumption that the employer unlawfully discriminated against him, and

the burden of production shifts to the employer to present evidence that it undertook its action for a legitimate, nondiscriminatory reason. *Id.* If the employer meets this burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to "show that the proffered reason really is a pretext for unlawful discrimination." *Id.* at 1272–73. Although the burdens of production shift back and forth under this framework, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Id.* at 1273.

In the context of a plaintiff's allegation that an employer discriminated against him by failing to promote him, we have held that a plaintiff can establish a prima facie case of discrimination by showing the following: (1) he was a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected despite his qualifications; and (4) the individual who received the promotion was not a member of his protected class and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998).

Under the second step of the *McDonnell-Douglas* framework, the employer must clearly explain the nondiscriminatory reasons for its actions, but it need not establish those reasons by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259–60 (1981). A subjective reason for an employer's action can constitute a legitimate, nondiscriminatory reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1033 (11th Cir. 2000)

(*en banc*).  But for a subjective reason to constitute a legally sufficient, legitimate, nondiscriminatory reason, the defendant must articulate "a clear and reasonably specific factual basis upon which it based its subjective opinion." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1106 (11th Cir. 2001) (quotation marks omitted), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir.2008).

Under the third step of the *McDonnell-Douglas* framework, the court must consider all the evidence and "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and quotation marks omitted).  In doing so, the court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (citation and quotation marks omitted).  Rather than merely disputing the factual basis of an employer's proffered legitimate reasons, the plaintiff must call into question the employer's sincere belief in the factual basis. *Vessels*, 408 F.3d at 771.

Despite the *McDonnell-Douglas* framework, we have cautioned that it "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an

employment discrimination case," and that a plaintiff may also defeat a summary-judgment motion by presenting "a convincing mosaic" of circumstantial evidence that "raises a reasonable inference that the employer discriminated against [him]." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Thus, we have stressed that "the crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1240 (11th Cir. 2016). Accordingly, a plaintiff will survive summary judgment if he presents "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

The district court determined that Brown established a prima facia case of racial discrimination as to the five promotions. But the court determined that Wrigley offered legitimate and non-discriminatory reasons for not promoting Brown, and that Brown failed to show that these reasons were pretextual. On appeal, Wrigley does not challenge the district court's conclusion that Brown made out a prima facie case, and Brown's objections all go to the pretext issue. So we start our analysis at step three of the *McDonnell-Douglas* framework. At this step, Brown's claims for four of the five promotions fail because Brown has not done enough under the *McDonnell-Douglas* framework to raise a material issue of fact about whether Wrigley's proffered reasons were pretextual. As to Brown's March 2017 promotion, though, he has

raised a material issue of fact.  And given that situation and the rest of the record, under the "convincing mosaic" theory, we think Brown has sufficiently raised a material issue of fact about all five promotions.  We explain below.

Beginning with step three of the *McDonnell-Douglas* framework, for four of the five promotions, Brown did not present sufficient evidence to create a material issue of fact over whether Wrigley's proffered reasons for not promoting him were pretextual.  For the first denied position in February 2017, Wrigley provided evidence that the selected candidate received 4 out of 5 points from the hiring panel for his responses to interview questions, while Brown received only 3 of 5.  Similarly, for the final three positions, Wrigley pointed to Brown's poor interview performances as a legitimate, non-discriminatory reason not to promote him.

Brown argues that this rationalization is pretextual because it is too subjective.  But under the *McDonnell-Douglas* framework, in and of itself, that an explanation is subjective does not necessarily render it pretextual.  *See Chapman*, 229 F.3d at 1033.  Under our precedent, Wrigley's explanation is still "a clear and reasonably specific factual basis upon which [Wrigley] based its subjective opinion," *Bass*, 256 F.3d at 1106, because Wrigley supported it with contemporaneous evidence of Brown's inferior interview performance.  Brown fails to point to any other facts specific to the denial of these four promotions that creates a material issue of fact about

whether Wrigley's proffered explanation was pretext for racial discrimination.

As to the March 2017 promotion, though, Brown has done enough to raise a material issue of fact that Wrigley's nondiscriminatory reason for denying the promotion may be pretextual. To be sure, Wrigley asserts that Slotterback did not support Brown's promotion for that position because he lacked faith in Brown's conflict-resolution abilities. But the only conflict-resolution problems Wrigley points to occurred before Brown applied for the *February 2017* promotion a month earlier than the March 2017 promotion—and Slotterback ultimately supported Brown's application for the February position. Wrigley points to no additional conflict-resolution issues that occurred between Slotterback's support of Brown's application for the February 2017 promotion and his refusal to support Brown's application for the March 2017 promotion. And of the five promotions for which Brown sought to apply, the March 2017 promotion was the only one where the hiring manager was Black. Given these circumstances, a reasonable jury could conclude that Wrigley's explanation for Slotterback's failure to support Brown's application did not ring true. So we conclude that Brown has raised a material issue of fact over whether Wrigley's proffered reason for denying Brown a promotion in March 2017 was pretextual for discrimination.

But as we have explained, satisfying the *McDonnell-Douglas* framework is not the only way to survive summary judgment. Rather, the question we must answer is whether Brown presents

"circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Hamilton*, 680 F.3d at 1320. Another way to do this is through the "convincing mosaic" theory. Under it, "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (citation and quotation marks omitted).

We conclude that Brown has set forth sufficient evidence to allow a reasonable jury to conclude that discrimination was a motivating factor behind Wrigley's denial of Brown's promotions. To be sure, when we consider only the *direct* evidence *specific* to the four promotions other than the March 2017 one, Brown has failed to raise a material issue of fact about whether Wrigley discriminated. But the "convincing mosaic" theory allows Brown to add more general evidence of discriminatory intent to the equation.

And here, that matters. Besides the circumstances we have described above, of the five positions that Brown applied for and was denied, three of them were initially filled by Wrigley on an "interim" basis before the same person was hired for the role permanently. Brown presented evidence that these "interim positions" were not advertised and were filled when supervisors asked employees—consistently white employees—to serve in that capacity, giving them a leg up in the application process for the permanent position. Then, when it came time to hire for the role

permanently, Wrigley almost inevitably hired the person who filled the interim role. In fact, it was undisputed that all three of the candidates who received the interim positions for the five promotions Brown sought and who were then were hired permanently instead of Brown were white. And the employees who were promoted over Brown for all five jobs were white.

Not only that, but despite being passed over, in some cases, Brown was required to train the selected employee to do the managerial job. And he "was often tasked with training other Shift Leads and overseeing additional Lines in the absence of Leads."

The Flowery Branch plant has approximately 1,000 employees, and 25% to 40% of the employees are Black. Yet Brown presented evidence that in the more than 20 years he had been there, only three Black employees were ever promoted to management positions. Wrigley managers themselves could recall a total of only a handful of Black employees who were promoted to management, even though Black employees regularly applied for such promotions. And Brown, who earned a Bachelor's degree, was consistently passed over for white candidates who had significantly less education—even though Brown was told on at least one occasion that obtaining another degree would help him receive a promotion.

This raises a material issue of fact about whether discrimination was a motivating factor in Wrigley's denial of Brown's March 2017 promotion. And altogether, these tiles—the potential abuse of the "interim position" system, the fact that only white candidates

were promoted over Brown, the exceedingly low numbers of promotions of Black candidates, the fact that Wrigley regularly promoted white people with significantly less education than Brown while telling Brown that obtaining another degree would help him get a promotion, combined with the subjective nature of Wrigley's proffered reasons for denying Brown's promotions—are enough under the "convincing mosaic" theory to raise a material issue of fact over whether discrimination was a motivating factor in denying Brown's other four promotions.  As we've noted, Wrigley offers subjective explanations for all of these points, and they may well be legitimate, but that is for a jury to determine.

Accordingly, we reverse the district court's grant of summary judgment with respect to Brown's Title VII race discrimination claim under the convincing mosaic theory.

## IV.

Under Title VII, an employer may not retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The three-step, burden-shifting *McDonnell-Douglas* framework also applies to cases of retaliation relying on circumstantial evidence. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). To establish that a plaintiff engaged in statutorily protected expression, the plaintiff must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) (citation and quotation marks omitted). Examples of protected activities include formal complaints and informal complaints such as informally voicing complaints to superiors or using an employer's internal grievance procedures. *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). To engage in statutorily protected activity, the plaintiff must "explicitly or implicitly communicate[] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation and quotation marks omitted) (alteration in original).

"The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington*, 261 F.3d at 1266. (citation and quotation marks omitted). Nonetheless, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). A plaintiff can

establish a causal link by showing that a desire to retaliate was the "determinative influence" on the employer's decision to take an adverse action. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1337 (11th Cir. 2013).

The plaintiff may also prove causation by showing that the employer knew of his statutorily protected activity, and there was a close temporal proximity between this awareness and the adverse employment action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). In the absence of any other evidence tending to show causation, a claim of retaliation fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action." *Id.* We have determined that a time interval of three to four months between the protected activity and termination is too attenuated, as a matter of law, to satisfy the causation element of a retaliation claim. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Here, the district court held that Brown did not establish a prima facie case of retaliation because he did not show a causal connection between the alleged protected activities and any adverse actions. The protected activities that Brown engaged in included the following: complaining to supervisors in April 2017 about being passed over for the February and March 2017 promotions and expressing that he believed that it was due to his race; filing an EEOC charge in February 2018; and commencing this lawsuit in August 2018.

After Brown's protected activity in April 2017, the next promotion denials were in October 2017 and January 2018. So at least five months passed between Brown's complaints in April and his promotion denial in October, which is too long to show temporal proximity under our precedent. *See Thomas*, 506 F.3d at 1364. Plus, Brown presented no evidence that the people in charge of hiring for those positions knew that Brown had made the complaints.

Brown also argues that he was retaliated against for his April 2017 protected activity when Slotterback sent an email letting Brown's team know that workloads would be increased, overtime would have to be requested 24 hours in advance, and "denying personal assistance." We assume, as the district court did, that any effects of the email would constitute an adverse action for retaliation purposes. But Brown failed to show that Slotterback was motivated by a retaliatory intent when he sent that email. Slotterback sent the email to all the Shift Leads in Brown's department, not just Brown. Nor was there any evidence, other than Brown's unsubstantiated assertions, that Slotterback knew at the time he sent the e-mail that it would lead to an increased workload for Brown. And again, there was no evidence that Slotterback knew about Brown's complaints when he sent the email.

As for the other protected activity, the only alleged adverse action that followed it was Brown's demotion during the restructuring. But Wrigley provided legitimate nonretaliatory reasons for demoting Brown, which Brown did not rebut. Wrigley restructured the entire Tab, and Brown presented no evidence that the

purpose of the restructuring was to retaliate against Brown. Instead, Wrigley presented evidence of why it needed to restructure—Tab sales had changed, and the department needed to switch from eight-hour shifts to twelve-hour shifts, resulting in too many Shift Leads in the department. Wrigley gave the associates in Tab a "volunteer form" to fill out, which allowed associates the chance to indicate the role they would prefer to move into if they were not selected to remain in Tab. On Brown's volunteer form, he indicated that, of the positions listed, he preferred to move to the Processing Department as a Sheeting Operator on the afternoon shift. To determine which Shift Leads would not remain in the restructured Tab and assess their pertinent competencies, the Shift Leads' managers completed a job-competency assessment for each of the Shift Leads. Of the eight Shift Leads, the managers ranked Brown last, so he was demoted to Senior Sheeting Operator in the Processing Department. Brown failed to show that this explanation for demoting him was pretext for retaliating against him for filing the EEOC complaint or the instant lawsuit.

Brown either failed to rebut Wrigley's legitimate reasons for its adverse actions against him or failed to show a causal link between his protected activity and the adverse actions. Accordingly, the district court did not err in granting the defendants' motion as to Brown's retaliation claims, and we affirm.

## V.

For the foregoing reasons, we affirm the grant of summary judgment on the retaliation claim, and we vacate the judgment on

the discrimination claims and remand for further proceedings consistent with the is opinion.

**AFFIRMED IN PART AND VACATED AND REMANDED IN PART.**